**EDGE GROUP WAICCS LLC, Plaintiff,**

v.

**The SAPIR GROUP LLC, Defendant.**

**No. 08 Civ. 5158(MHD).**

United States District Court, S.D. New York.

April 7, 2010.

David C. Segal, Douglas Ian Segal, Sukenik, Segal & Graff, P.C., New York, NY, for Defendant.

## MEMORANDUM & ORDER

MICHAEL H. DOLINGER, United States Magistrate Judge:

Plaintiff Edge Group WAICCS, LLC ("Edge Group") commenced this lawsuit to seek specific performance of a contract for the sale of an interest in a limited liability company. The anticipated transaction would have involved a payment of $20 million by defendant Sapir Group LLC ("Sapir") in exchange for a 50 percent interest in WAICCS Las Vegas 2 LLC, a limited liability company that was the sole member of another limited liability company, WAICCS Las Vegas 3 LLC.[1] WAICCS 3 in turn holds a 20.4 percent undivided ownership interest in a parcel of undeveloped real estate in Las Vegas, Nevada.

In responding to the complaint (as amended), defendant admitted that it had not proceeded with the purchase, as required under an option that it had exercised. It contended principally, however, that plaintiff was not entitled to specific performance and was limited to the receipt of one million dollars that Sapir had previously placed in an escrow account in compliance with the requirement of the amended Option Agreement into which Sapir had entered with plaintiff.

At the conclusion of discovery, both parties have moved for summary judgment. Sapir seeks, in substance, a determination that plaintiff's relief is limited to payment of the one million dollars now held in escrow, or, possibly, no payment at all because it has not proven or mitigated its damages. Plaintiff seeks entry of judg-

Marc E. Kasowitz, Paul Michael O'Connor, III, Seth A. Moskowitz, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, for Plaintiff.

---

1. In this Memorandum and Order, we refer to these two LLCs as "WAICCS 2" and "WAICCS 3", respectively.

ment ordering specific performance of the contract, that is, payment of $20 million in exchange for tender of its ownership interest in WAICCS 2.[2]

For the reasons that follow, plaintiff's motion is granted in part and defendant's motion is denied in its entirety.

### A. Summary Judgment Standards

Before addressing the parties' summary-judgment motions, we summarize the pertinent standards for assessing such a motion. The court may enter summary judgment only if it concludes that there is no genuine dispute as to the material facts and that, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Feingold v. New York, 366 F.3d 138, 148 (2d Cir.2004). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Shade v. Hous. Auth. of the City of New Haven, 251 F.3d 307, 314 (2d Cir.2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). It is axiomatic that the responsibility of the court in deciding a summary-judgment motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986); see, e.g., Ricci v. DeStefano, —— U.S. ——, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009); Anderson, 477 U.S. at 255, 106 S.Ct. 2505; Howley v. Town of

Stratford, 217 F.3d 141, 150–51 (2d Cir. 2000).

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the "pleadings, the discovery and disclosure materials on file, and any affidavits" that demonstrate the absence of a genuine issue of material fact. Fed.R.Civ.P. 56(c); see, e.g., Celotex, 477 U.S. at 323, 106 S.Ct. 2548; Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir.2002). If the non-moving party has the burden of proof on a specific issue, the movant may satisfy its initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. See, e.g., Celotex, 477 U.S. at 322–23, 325, 106 S.Ct. 2548; PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101, 105 (2d Cir.2002); Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). If the movant fails to meet its initial burden, however, the motion will fail even if the opponent does not submit any evidentiary materials to establish a genuine factual issue for trial. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 160, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Giannullo v. City of New York, 322 F.3d 139, 140–41 (2d Cir. 2003).

If the moving party carries its initial burden, the opposing party must then shoulder the burden of demonstrating a genuine issue of material fact. See, e.g., Beard v. Banks, 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006); Celotex, 477 U.S. at 323–24, 106 S.Ct. 2548; Santos v. Murdock, 243 F.3d 681, 683 (2d Cir.2001). In doing so, the opposing party cannot rest "merely on allegations or denials" of the factual assertions of the movant, Fed.R.Civ.P. 56(e); see, e.g., Goldstein

---

**2.** Plaintiff also seeks prompt release to it of the escrowed funds. (Pl. Edge Group WAICCS

LLC's Mem. of Law in Supp. of its Mot. for Summ. J. ("Pl.'s Mem. in Supp."), 24–25).

*v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti,* 374 F.3d 56, 59–60 (2d Cir. 2004), nor can it rely on its pleadings or on merely conclusory factual allegations. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). It must also "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005). Rather, it must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. *See, e.g., Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 526 (2d Cir.1994).

If both sides move for summary judgment, the court must independently assess each motion. If either movant fails to demonstrate that the material facts are undisputed and dictate judgment for that party, then that party's motion must be denied. *See, e.g., Krauss v. Oxford Health Plans, Inc.,* 517 F.3d 614, 621–22 (2d Cir. 2008); *White River Amusement Pub, Inc. v. Town of Hartford,* 481 F.3d 163, 167 (2d Cir.2007).

### B. *The Record Facts*

Most of the pertinent facts are undisputed, although the inferences to be drawn from those facts are the subject of extensive, and often repetitive, briefing. We first summarize the evidence presented to us, indicating those factual contentions that seem to be disputed.

Plaintiff Edge Group is a limited liability company that engages in real estate investment and development in Las Vegas, Nevada. (Decl. of Reagan Silber in Supp. of Edge Group's Mot. for Summ. J., executed June 26, 2009, ¶ 2). Edge Group and Credit Suisse Management LLC ("Credit Suisse") are the sole members of WAICCS 2, with each of them owning a fifty-percent share of the company. (*Id.* at ¶ 4). Under the operating agreement for WAICCS 2, neither member may transfer its interest to a competitor without prior written consent of the other member. (*Id.* at ¶¶ 5–6; Decl. of Paul M. O'Connor III, Esq. in Supp. of Edge Group's Mot. for Summ. J., executed June 26, 2009, Ex. 3 at f 10.02). WAICCS 2 is the sole member of WAICCS 3, a Delaware limited liability company that owns a 20.4 percent undivided interest, as a tenant-in-common, in a parcel of largely undeveloped real estate in Las Vegas. (Silber Decl. at ¶¶ 7–8). The intended development plan for the site involved the construction of a "several thousand room hotel and casino . . . ." (*Id.* at ¶ 10). Under the terms of the tenancy-in-common agreement between WAICCS 3 and the co-owners of the property, WAICCS 3 was permitted to transfer a majority of its interest in the property only upon unanimous consent of the other owners, and was permitted to transfer up to 49 percent of its interest only to a noncompetitor of the other owners, with a competitor being broadly defined as an entity that "engages in, or manages or directs Persons that engage in, a business which is identical or similar to, or in direct competition with, the business conducted by any of the Owners (or their Affiliates) at the time such Transfer anywhere in the United States." (O'Connor Decl., Ex. 7 at § 7.1(a), (c); Silber Decl. at ¶¶ 11–12). For transfers that required the consent of the other owners, those owners possessed a right of first offer. (*Id.,* Ex. 7 at § 7.2).

On November 5, 2007 Edge Group and Credit Suisse entered into a Call Option Agreement under which plaintiff granted Credit Suisse an option to purchase Edge Group's interest in WAICCS 2 for the price of $20 million plus any amounts that Edge Group had contributed to the compa-

ny in the period from the execution of the Call Option Agreement until the closing of the purchase of the Edge Group's interest pursuant to the option. (Silber Decl. at ¶¶ 18, 20; O'Connor Decl., Ex. 1 at p. 2). The Call Option Agreement defined the option exercise period as extending for sixty days from November 5, 2007, until 5:00 p.m. on January 4, 2008. (O'Connor Decl., Ex. 1 at pp. 1–2).

To exercise the option, Credit Suisse was required to deliver to Edge Group a timely "Call Exercise Notice." (*Id.,* Ex. 1 at § 2.04). The Agreement also gave Credit Suisse the right, subject to certain conditions, to assign the option to another party. (*Id.,* Ex. 1 at p. 2 & § 3.08). The apparent premise for this arrangement was the understanding that Credit Suisse would in fact undertake a search for an interested buyer and would then assign the option to that buyer. (Silber Decl. at ¶¶ 15–18).

The Call Option Agreement also contained a provision, in Article III, reciting that "[a]ll rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights and remedies otherwise available." (O'Connor Decl., Ex. 1 at § 3.10). The same article also contained an integration provision, stating that "[t]his Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supercedes all prior agreements and undertakings, both written and oral, between the parties with respect to the subject matter hereof." (*Id.,* Ex. 1 at § 3.07).

On December 17, 2007 Edge Group and Credit Suisse executed an Amendment of the Call Option Agreement. Under its terms, the Call Exercise Period was extended to February 15, 2008. (*Id.,* Ex. 5 at ¶ 12 & Ex. 12 at p. 2).

Following the signing of the original Option Agreement, Credit Suisse undertook a search for a potential interested buyer, and found only one, the defendant Sapir Group. (*Id.,* Ex. 4 at 29–31; Silber Decl. at ¶ 19). Accordingly, on February 15, 2008—the then-current expiration date for the Option Agreement—Credit Suisse assigned its option to Sapir Group. (Silber Decl. at ¶¶ 21–22). At the same time, Edge Group, Credit Suisse and Sapir signed a Letter Amendment to Option Agreement, which extended the expiration date for exercising the option to May 1, 2008. (O'Connor Decl., Ex. 13 at 1).

This second amendment, in the form of a letter dated February 15, 2007[3], stated that it constituted "a further amendment to the Option Agreement." It recited that, pursuant to section 3.08 of that Option Agreement, Credit Suisse had assigned the option to Sapir. (*Id.,* Ex. 13 at 1). It also contained language specifying that Sapir was to deposit one million dollars in an escrow account simultaneously with the execution of the Amendment. (*Id.,* Ex. 13 at 2). The pertinent language governing the use of the escrowed funds reads as follows:

> The parties acknowledge that the Escrow Fund represents a deposit toward the payment of the Purchase Price to be paid by Sapir (or its Sapir Permitted Designee) to the Edge Group as consideration for the sale of the Edge Interest. In accordance with the terms of the Escrow Agreement, the Escrow Agent shall disburse and deliver the Escrow Fund by wire transfer of immediately available funds pursuant to joint written instructions delivered to the Escrow Agent by Sapir and the Edge Group. Each of Sapir and the Edge Group hereby agree that they shall execute and

(*Id.,* Ex. 13 at 1).

---

**3.** The letter Amendment of February 15, 2008 was erroneously dated as February 15, 2007.

deliver Joint Instructions to the Escrow Agent at such time, and with such instructions, so as to cause the Escrow Fund to be released to the Edge Group (i) if a Call Exercise Notice shall not have been delivered by Sapir (or its Sapir Permitted Designee) by the Expiration Date, promptly (and, in any event, within three Business Days) after the Expiration Date, (ii) *if Sapir (or its Sapir Permitted Designee) shall have delivered a Call Exercise Notice, at the closing of the sale of the Edge Interest to Sapir (or its Sapir Permitted Designee) and credited towards the payment of the Purchase Price or (iii) if Sapir (or its Sapir Permitted Designee) shall have delivered a Call Exercise Notice but shall have failed to consummate the Closing, on the Business Day after the date scheduled for the Closing; provided,* that if the failure by Sapir (or its Sapir Permitted Designee) to deliver a Call Exercise Notice or to consummate the Closing is as a result of the breach of the Seller's Representations and Warranties or the agreement of the Edge Group contained in the Option Agreement or the agreement assigning the Edge Interest to Sapir (or its Sapir Permitted Designee), or the fraud, intentional misconduct or criminal conduct of Edge–Star, ELVD or the Edge Group, then Sapir and the Edge Group shall issue Joint Instructions to the Escrow Agent to provide that the Escrow Fund shall be disbursed and delivered to Sapir.

(*Id.,* Ex. 13 at 2) (emphasis in original). The parties dispute the purpose of requiring deposit of the escrowed funds. Edge Group maintains that it required the one-million-dollar deposit as compensation for

extending the option exercise period until May 1, 2008. (Pl.'s R. 56 Statement at ¶ 61 & O'Connor Decl., Ex. 12 at 23). On the other hand, Sapir asserts that the one-million-dollar deposit was to function as liquidated damages in the event of a default. (O'Connor Decl., Ex. 2 at 120). Finally, the Amendment specified that "[t]he provisions of Article III of the Option Agreement shall apply to, and are hereby incorporated with, this letter, *mutatis mutandis.* (*Id.,* Ex. 13 at 2).

At the time of the execution of these documents, Sapir delivered the required escrow funds to the Escrow Agent. (Def.'s Answer at ¶ 9; Pl.'s R. 56.1 Statement at ¶ 62. *See also* Silber Decl. at ¶ 33). On May 1, 2008, the last day on which the option was in effect, Sapir delivered a Call Exercise Notice to Edge Group and scheduled the closing for May 30, 2008. (O'Connor Decl., Ex. 12 at pp. 5–6 & Ex. 15). The effect of that act was to create a binding contract for the sale to Sapir of Edge Group's interest in WAICCS 2.[4]

The closing was scheduled for May 30, 2008. Before the scheduled closing, plaintiff delivered to Sapir all required documents for the transaction to close. (O'Connor Decl., Ex. 12 at pp. 6–7; Silber Decl. at ¶ 30). On May 29, 2008, however, Sapir notified Edge Group that it had decided not to go through with the closing and purchase. (Decl. of Alex Sapir in Supp. of Def.'s Mot. for Partial Summ. J., ¶ 2; Silber Decl. at ¶ 32). The decision by Sapir was not based on any failure of Edge Group to perform. (*See* O'Connor Decl., Ex. 2 at 134 & Ex. 12 at p. 5). Instead, defendant stated that it had decided to abandon the transaction because of the

---

**4.** We note that Sapir has declined plaintiff's request to admit this fact. (O'Connor Decl., Ex. 12 at p. 6). However, as Sapir appears to concede Edge Group's entitlement to liqui-

dated damages, which presumes the existence and breach of a contract, we take it that the parties are in fact in agreement on this point.

speculative nature of the project planned for development on the site. (*Id.,* Ex. 4 at 55. *See also id.,* Ex. 2 at 134–35 (stating that Sapir refused to close because they "decided [they] had better uses for [their] funds")).

Plaintiff commenced suit on June 4, 2008, seeking principally specific performance. It amended its complaint a few days later, and Sapir filed an answer, including several affirmative defenses, on September 16, 2008. The principal thrust of the answer is that, under the Amended Option Agreement, plaintiff's only remedy for the breach is payment of the escrow funds.

### C. *Assessment of the Motions*

Viewing the record through the prism of the summary-judgment criteria that we have summarized, we first address the question of whether either party has demonstrated, as a matter of law, that specific performance either is or is not appropriate in this case, based on traditional equitable considerations. We then consider whether—as defendant contends—this analysis should be altered by the inclusion in the Option Agreement, as amended, of what Sapir describes as a liquidated-damages provision capped at one million dollars that was intended to preclude any other form of relief.

#### 1. *The Availability of Specific Performance*

■ Both sides seek summary judgment on the question of whether Edge Group should be awarded specific performance. That form of relief involves an exercise of the court's equitable powers. *See generally* E. Allan Farnsworth, "Legal Remedies for Breach of Contract", 70 Colum. L.Rev. 1145, 1152–56 (1970). For Edge Group to justify its entitlement to such a remedy, it must first establish the existence of a contract with Sapir, Sapir's breach of that contract by non-performance, Edge Group's substantial perform-

ance of its obligations under the Option Agreement and its ability and willingness to undertake any additional steps required of it under the contract. *See, e.g., Alba v. Kaufmann,* 27 A.D.3d 816, 818, 810 N.Y.S.2d 539, 540 (3d Dep't 2006); *EMF Gen. Contracting Corp. v. Bisbee,* 6 A.D.3d 45, 51, 774 N.Y.S.2d 39, 44 (1st Dep't 2004), *leave denied,* 3 N.Y.3d 607, 785 N.Y.S.2d 25, 818 N.E.2d 667 (2004), *leave dismissed,* 3 N.Y.3d 656, 782 N.Y.S.2d 695, 816 N.E.2d 568 (2004); *Bonner v. Guerrieri,* 26 Misc.3d 1205(A), 2009 WL 5183777, *2–3, 4–5 (Sup.Ct.N.Y. County Dec. 31, 2009). In addition, Edge Group must demonstrate that the invocation of the court's powers in equity is justified by the absence of an adequate remedy at law. *E.g., Van Wagner Adver. Corp. v. S & M Enters.,* 67 N.Y.2d 186, 192–94, 501 N.Y.S.2d 628, 631–33, 492 N.E.2d 756 (1986) (discussing difficulties in measuring legal damages); *Alba,* 27 A.D.3d at 818, 810 N.Y.S.2d at 540; *EMF Gen. Contracting Corp.,* 6 A.D.3d at 51, 774 N.Y.S.2d at 44.

There is no dispute in this case that a valid and binding contract providing an option to Sapir was entered into by way of the assignment of the original option from Credit Suisse to Sapir in conjunction with amendments to the Option Agreement. There is also no real dispute that, pursuant to the terms of that amended Agreement, defendant gave notice of its exercise of the option on May 1, 2008, within the contractual period for doing so, and that this step created a binding contract for the sale to Sapir of Edge Group's interest in WAICCS 2. The record also reflects that Edge Group fulfilled all of its pre-closing obligations under the contract, that Sapir communicated on May 29—one day before the scheduled closing—its refusal to go ahead with the purchase, and that that decision was not a consequence of any

failure by Edge Group to perform or of any other form of misconduct by plaintiff.

In sum, there is no question that the parties entered into a valid contract for the sale of plaintiff's interest in WAICCS 2 and that defendant breached its contractual obligation to purchase that interest. The remaining question is whether, in these circumstances, it is appropriate for the court to order specific performance of that contract by Sapir because of the inability of legal damages to compensate plaintiff fully.

■ In assessing this question, we note that the guiding consideration is " 'the difficulty of proving damages with reasonable certainty.' " *Van Wagner Adver. Corp.*, 67 N.Y.2d at 193, 501 N.Y.S.2d at 632, 492 N.E.2d 756 (quoting *Restatement (Second) of Contracts* § 360[a] (1981)). Although case law; refers, in appropriate circumstances, to the uniqueness of the product that was the subject of a breached contract in a sale context, that is ultimately not the test; rather, in all cases the court must address the practical question of whether the damages of the aggrieved party can be reliably determined:

> The point at which breach of a contract will be redressable by specific performance thus must lie not in any inherent physical uniqueness of the property but instead in the uncertainty of valuing it. "What matters, in measuring money damages, is the volume, refinement, and reliability of the available information about substitutes for the subject matter of the breached contract. When the relevant information is thin and unreliable, there is a substantial risk that an award of money damages will either exceed or fall short of the promisee's actual loss. Of course this risk can always be reduced—but only at great cost when reliable information is difficult to obtain. Conversely, when there is a great deal of consumer behavior generating abundant and highly dependable information about substitutes, the risk of error in measuring the promisee's loss may be reduced at much smaller cost. In asserting that the subject matter of a particular contract is unique and has no established market value, a court is really saying that it cannot obtain, at reasonable cost, enough information about substitutes to permit it to calculate an award of money damages without imposing an unacceptably high risk of undercompensation on the injured promisee."

*Id.* at 193, 501 N.Y.S.2d at 632, 492 N.E.2d 756 (quoting Anthony T. Kronman, "Specific Performance", 45 U. Chi. L.Rev. 351, 362 (1978)). *Cf. Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*, 69 A.D.3d 212, 217, 221–22, 889 N.Y.S.2d 793, 798, 801–02 (4th Dep't 2009).

■ In applying this test, the trial court has broad discretion, *Van Wagner Adver. Corp.*, 67 N.Y.2d at 191–92, 501 N.Y.S.2d at 631, 492 N.E.2d 756, although certain parameters have been recognized by the New York courts. Thus, real estate is deemed to be inherently unique, a notion that has led to a pattern of decisions granting purchasers specific performance of real-estate sale contracts. *E.g., Alba*, 27 A.D.3d at 818, 810 N.Y.S.2d at 541; *EMF Gen. Contracting Corp.*, 6 A.D.3d at 52, 774 N.Y.S.2d at 44–45; *Bonner*, 2009 WL 5183777, at *4. *See also Van Wagner Adver. Corp.*, 67 N.Y.2d at 192, 501 N.Y.S.2d at 631, 492 N.E.2d 756. Similarly, the courts have typically held that the shares of closely held corporations are not readily appraised and hence that specific performance is properly granted on contracts for the sale of those shares. *E.g., Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir.2008) (citing *inter alia In re Fontana D'Oro Foods*, 65 N.Y.2d 886, 888, 493 N.Y.S.2d 300, 301, 482 N.E.2d 1216 (1985)). More generally, the courts look to the specific

circumstances of the case to determine whether there is a sufficiently reliable means of measuring value for purposes of awarding contract damages. *E.g., JMG Custom Homes, Inc. v. Ryan,* 45 A.D.3d 1278, 1281, 844 N.Y.S.2d 817, 819–20 (4th Dep't 2007) (granting specific performance of an oral agreement to exchange two all-terrain vehicles and a snowmobile for a discount on the purchase price of a home because of the difficulty of calculating the value of the vehicles); *Garber v. Siegel,* 194 Misc. 966, 969, 87 N.Y.S.2d 597, 600 (Sup. Ct. Kings County 1948), *modified* on *other grounds,* 274 A.D. 1068, 1068, 86 N.Y.S.2d 456, 456 (2d Dep't 1949) (granting plaintiff specific performance of contract for sale of carbonated-beverage route and business where plaintiff helped develop business serving specific customers for many years and his loss of future profits could not readily be ascertained). *See also Destiny USA Holdings, LLC,* 69 A.D.3d at 221–22, 889 N.Y.S.2d at 801–02 (granting preliminary injunction requiring bank to fund draw requests on construction loan because of uncertainty in calculating damage to plaintiff's reputation and other harm stemming from inability to complete "groundbreaking" and "unprecedented" environmentally-friendly development project).

In this case, Sapir argues that measuring damages from its breach is not so inherently imprecise as to justify specific performance. It also argues that specific performance should be denied here based on two other equitable principles. It first cites plaintiff s obligation to mitigate its damages, and then asserts that specific performance should not be granted because it does not currently have the cash in hand to perform its end of the bargain, that is, to pay the $19 million owed for the purchase over and above the escrowed funds, an argument premised on the notion that specific performance will not be ordered if performance is impossible. *See*

*Restatement (Second) of Contracts* § 357 cmt. C (1981). We address these arguments separately.

### (a) *Adequacy of Legal Remedy*

In support of the contention that, as a matter of law, a legal remedy is adequate here, defendant notes that contract damages are normally measured by the difference between the value to the injured party of the performance that should have been provided by the breaching party and what the plaintiff was left with in the wake of the breach. Applying this principle, defendant contends that the difference between the $20 million purchase price and the value of Edge Group's interest in WAICCS 2 at the time of defendant's breach may be reliably determined. (Def.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Def.'s Mem. in Supp."), 7; Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem. in Opp'n"), 9–10). For this proposition, Sapir relies principally on the fact that an appraisal of the real estate parcel owned in common by WAICCS 3 and other parties was performed shortly after defendant's breach, and resulted in a valuation of $788 million. (Def.'s Mem. in Supp. at 7; Decl. of Douglas Segal, Esq. in Supp. of Def.'s Mot. for Partial Summ. J., executed June 19, 2009, Ex. 7). Defendant further asserts that this valuation should be binding on plaintiff because the appraisal was prepared on behalf of the property owners, including Edge Group, outside of the context of this litigation, and was later used to extend the payment schedule for a loan secured by the property. (Def.'s Mem. in Supp. at 7 & n. 4; Def.'s Mem. in Opp'n at 10 & n. 7; Def.'s Reply Mem. of Law in Further Supp. of its Mot. for Partial Summ. J. ("Def.'s Reply Mem."), 17–18). As further evidence of value, defendant also mentions, albeit without documentation, that Sapir itself paid approximately $21 million at about the same time for a

share of a company that was a co-tenant of the Las Vegas property. (Def.'s Reply Mem. at 3–4, 19–20; Supplemental Decl. of Alex Sapir in Opp'n to Pl.'s Mot. for Summ. J., executed July 30, 2009, § 2). Based on these facts, defendant asserts that the court can value the Edge Group's interest that Sapir failed to purchase for $20 million, and that in fact the value of that interest exceeded the purchase price, thus—unless the one million dollar deposit is considered liquidated damages—compelling the conclusion that plaintiff is entitled to no damages. (Def.'s Mem. in Supp. at 11). We consider these arguments in turn.

The appraisal of the property owned in part by WAICCS 3—which Sapir cites to establish the value of Edge Group's interest in WAICCS 2—was undertaken in June 2008 at the request of Credit Suisse, not Edge Group (Supplemental Decl. of Paul M. O'Connor III, Esq. in Opp'n to Def.'s Mot. for Partial Summ. J., executed July 30, 2009, Exs. 2 at 7, 18, 21 & 4), although that fact is not crucial for present purposes.[5] More relevant, however, are certain details about both the context of the appraisal, the substance of the appraisal report, and the testimony of the person who prepared it.

■ The appraisal was of the Las Vegas parcel itself, not of the value of an interest in WAICCS 2, which was the asset to be sold under the Option Agreement. This distinction is important for several reasons.

Edge Group's ownership interest was in WAICCS 2, which in turn had an ownership interest in WAICCS 3, which in turn had an interest, in the form of an undivided tenancy-in-common with several other entities, in the undeveloped real property

that was appraised. Moreover, the terms that governed the tenancy-in-common of the parcel sharply limited the ability of WAICCS 3—in which Edge Group held an interest through WAICCS 2—to sell its interest in the property. Thus, WAICCS 3 was precluded from selling a majority of its interest absent the unanimous consent of the other co-tenants in the Las Vegas parcel, and it could not sell even a minority of its interest to any broadly-defined competitor of those co-tenants. (O'Connor Decl., Ex. 7 at Art. VII, Ex. 2 at 75 & Ex. 4 at 18–19, 27–28). It is not surprising, then, that the sale of the Edge Group interest in WAICCS 2 was characterized by Credit Suisse as "very complicated to say the least". (Id., Ex. 4 at 27–28).

The June 2008 appraisal of the parcel, cited by Sapir, did not consider the impact of these restrictions since it was looking only to the prospects for sale of the real estate rather than of the encumbered Edge Group interest in one of the two LLCs in the ownership chain. (See generally Segal Decl., Ex. 7). Necessarily, then, that appraisal would not reflect a valuation of the Edge Group's interest, much less an assessment of the viability of valuing that interest. (O'Connor Supplemental Decl., Ex. 1 at 27).

■ Apart from the general irrelevance of the June 2008 appraisal to the question of the adequacy of a legal remedy in this case, the substance of the appraisal report—viewed in light of the testimony of the appraiser—reflects that it has no probative weight even as an assessment of the value of the parcel at the time of defendant's breach, much less as an indicator that one could reliably value the LCC interest of plaintiff. The same appraiser

---

**5.** The potential import of this fact, as well as the uncontradicted testimony of plaintiff's principal that Edge Group was not even aware of the appraisal until some time during the pendency of the lawsuit, (Id., Ex. 2 at 39)

is that the appraisal cannot be deemed an admission by Edge Group as to either the feasibility of a valuation of its interest in WAICCS 2 or of the actual value of that interest.

had performed an appraisal of the property in January 2008 and offered the figure of $788 million, (*Id.*, Ex. 3). He then performed a comparable appraisal in June of that year and, in an identically-worded report, he arrived at the same figure. (*Id.*, Ex. 1 at 21, 25. *See also id.*, Ex. 4). In his deposition testimony, however, he conceded that he had found no comparable sales during the relevant period and hence had simply utilized the prior number. (*Id.*, Ex. 1 at 22–23, 103, 105). Moreover, he conceded that he had had no pertinent data or information on which to base an appraisal, stating "we didn't have evidence to get to our conclusions." (*Id.*, Ex. 1 at 105).

The market conditions at that time only underscore the absence of a basis for the June 2008 appraisal. As all parties concede, the appraisal was made during the period of the recent financial and real-estate bubble collapse and accompanying major economic downturn, including a collapse in the market for commercial real estate on the Strip in Las Vegas. (*E.g.*, *id.*, Ex. 1 at 103–05). Indeed, as the appraiser testified, there was a major downturn in business during this period, including in the gaming industry, and there were no sales of comparable properties from late 2007 to April 2009. (*Id.*, Ex. 1 at 22–23, 103–05). Indeed, it was apparently at least in part because of these conditions (1) that Edge was very anxious to sell its interest, (O'Connor Decl., Ex. 4 at 26–27) (2) that Sapir was the only potential buyer that Credit Suisse could locate, (O'Connor Supplemental Decl., Ex. 2 at 34–85) (3) that Sapir decided at the last minute to repudiate its contractual obligation to purchase because the investment was too "speculative" (O'Connor Decl., Ex. 4 at 55), and (4) that Alex Sapir testified that "[i]t

wouldn't be a good deal to put any new money in this deal in the current environment." (*Id.*, Ex. 2 at 171).

Under all of these circumstances, and consistent with *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny, the appraiser could not be a competent expert on the valuation of the parcel itself as of June 2008, much less on the value of the Edge Group's interest in WAICCS 2. *See, e.g., Nimely v. City of New York*, 414 F.3d 381, 396–97 (2d Cir. 2005) (" '[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.' " (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002)); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir.2008) ("At trial, proffered 'expert testimony should be excluded if it is speculative or conjectural.' ") (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996))). Necessarily, then, the appraiser's June 2008 appraisal of the parcel cannot be deemed at all probative as to the availability of a reasonably accurate valuation of the plaintiff's interest in WAICCS 2.

 As for defendant's brief allusion to its asserted purchase of an interest in another entity, which purportedly had an interest in the parcel at issue, it offers no details or documentation, and relies solely on a passing reference by Alex Sapir. (Sapir Supplemental Decl. at ¶ 2). That brief and conclusory testimony is plainly not sufficient to establish that the value of plaintiff's interest in WAICCS 2 can be reliably determined.[6]

---

**6.** In addition to the lack of evidentiary sufficiency, we note that there may be relevant factual differences between the interests of

Edge Group and the entity from which Sapir purchased an interest in the Las Vegas parcel that would affect their respective values, in-

■ Given that doubts about the adequacy of a damage remedy should be resolved in favor of awarding specific performance, *Restatement (Second) Contracts* § 359 cmt. a (1981), and in light of the fact that none of the methods that defendant has devised for calculating the value of Edge Group's interest in WAICCS 2 at the time of defendant's breach are reliable, we conclude that Edge Group is entitled to summary judgment on the inability to calculate, and therefore the inadequacy of, its legal damages.[7]

### (b) *Other Grounds Asserted by Sapir to Deny Relief*

To the extent that defendant may be relying on two other arguments targeting the propriety of specific performance under traditional equitable principles, we review them briefly. First, Sapir has asserted in its answer that all relief should be denied because plaintiff failed adequately to mitigate its loss. (O'Connor Decl., Ex. 6 at p. 5). Additionally, Sapir contends that it would be impossible for it to perform its obligations under the contract to purchase Edge Group's interest. We review these claims in turn.

■ Insofar as Sapir asserts that plaintiff failed to mitigate its damages, the argument fails first and foremost because mitigation is not required in order to justify specific performance. *E.g., Mayer v. Mfrs. Trust Co.*, 11 Misc.2d 359, 361, 170 N.Y.S.2d 43, 46 (Sup.Ct. N.Y. County 1958). *Cf. Bonner*, 2009 WL 5183777 at *5. In addition, defendant cannot demonstrate, as a matter of law, that plaintiff failed to make reasonable attempts to mitigate. There is no dispute that Credit Suisse attempted to find a buyer on behalf of plaintiff, and could locate only Sapir, which in turn defaulted on its purchase contract, apparently as a result of market conditions. Moreover, as plaintiff points out, during the pendency of this lawsuit—filed only days after the default—it engaged in efforts to sell its interest to Sapir, albeit at a reduced price, and that effort apparently led to the scheduling of a closing, only to be frustrated when Sapir once again backed out at the last minute. (Silber Decl. at ¶¶ 34–38; O'Connor Decl., Ex. 2 at 154).[8] In short, the evidentiary record is

---

cluding that AI Nevada apparently sold Sapir a direct 20.41% interest in the Las Vegas property, whereas Edge Group's interest in the property was shared, through its interests in the WAICCS 2 and 3 entities, with Credit Suisse. (*See* Silber Decl. at ¶¶ 4, 7; Sapir Supplemental Decl. at ¶ 2).

7. We note that defendant's repeated contention that Edge Group is not entitled to specific performance because it was selling, instead of purchasing, an asset is misguided. (Def.'s Mem. in Supp. at 5–6; Def.'s Mem. in Opp'n at 7–9; Def.'s Reply Mem. at 16–17). Sapir notes that when a "party's contractual obligation is simply to pay a specified sum, a legal remedy [for that party's breach] ... is readily available." (Def.'s Mem. in Supp. at 5 (quoting *Morgan Stanley High Yield Sec. v. Seven Circle Gaming Corp.*, 269 F.Supp.2d 206, 222 (S.D.N.Y.2003))). But by Sapir's own analysis, awarding Edge Group money damages in this case would require a valuation of Edge Group's interest in WAICCS 2 as of the date of Sapir's breach. (*See, e.g.,* Def.'s Mem. in Supp. at 11 ("Edge must prove its damages based on the difference between the agreed upon purchase price and the value of Edge's interest *at the date of breach."* ) (emphasis in original)). It is the calculation of this value that we find uncertain, which establishes the inadequacy of a legal damage remedy in this case. Moreover, specific performance has been awarded in favor of sellers alleging breach of contract claims against purchasers. *See, e.g., Leasco Corp. v. Taussig*, 473 F.2d 777, 785–86 (2d Cir.1972).

8. Defendant argues that this aborted transaction should not be taken into consideration based on the preclusive effect of Fed.R.Evid. 408. (Def.'s Mem. in Opp'n at 5). This is misguided, since that rule precludes the use of settlement communications only as evidence of liability or the amount of damages. Fed.R.Evid. 408. *See PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d 109, 114 (2d Cir.2008). Here, plaintiff is using the evi-

consistent with reasonable efforts by plaintiff to mitigate.

Additionally, Sapir argues that specific performance may not be awarded because it is incapable of performing. In support of that contention, it proffers a declaration by Alex Sapir, asserting in entirely conclusory terms and without the benefit of any documentation, that defendant currently—or at least when Alex Sapir executed his declaration—has only $4,000.00 in cash and cash equivalents on hand and is more than $250,000,000.00 in debt. (Sapir Supplemental Decl. at ¶ 3). This skeletal assertion is plainly inadequate to demonstrate as a matter of law that defendant cannot perform even if ordered by a court to do so.

Both sides concur that impossibility may bar specific performance, but they differ on the precise scope of this rule. Plaintiff asserts that the test is whether the defendant was capable of performing at the time of the breach, not later on, and in support of this contention it notes that otherwise a breaching party may manipulate the outcome by deliberately divesting itself of the capacity to perform after its breach. (Pl. Edge Group WAICCS LLC's Reply Mem. of Law in Further Supp. of its Mot. for Summ. J. ("Pl.'s Reply Mem."), 12–13). Applying this standard, Edge Group asserts that Sapir was plainly capable of performing at the time of the breach, for which proposition it cites the deposition testimony of Alex Sapir that Sapir had the $20 million dollar purchase price available on the closing date. (Pl.'s Reply Mem. at 13 (citing O'Connor Decl., Ex. 2 at 134–35)). It also cites testimony to the effect that Alex Sapir and his company had available to them essentially limitless financing from Alex's father, Tamir Sapir, who was to provide the funds to purchase Edge Group's interest on the original closing date. (Id. (citing, inter alia, O'Connor Decl., Ex. 8 at 58–60)). It further offers facts from which one could draw the inference that defendant's finances have been deliberately manipulated to permit it to claim financial incapacity to pay for the option that it contracted to purchase less than two years ago. (Id.).

Defendant does not meaningfully dispute that it had the capacity at the time of the breach to pay for Edge Group's interest in WAICCS 2. Indeed, Alex Sapir admitted at his deposition that it could have done so, saying that "[a]t the time we decided we had better uses for our funds" and that it could have closed had it wanted to do so. (O'Connor Decl., Ex. 2 at 134–35). As noted, it even represents that it purchased an interest in another entity for more than $21 million only days before the cancellation of the closing with the Edge Group. (Sapir Supplemental Decl. at ¶ 2). In its opposition papers it asserts, however, that it has since lost the ability to perform—although it does not even attempt to document this assertion—and it presses the notion that this incapacity precludes equitable relief for the plaintiff. (Sapir Supplemental Decl. at ¶ 3; Def.'s Mem. in Opp'n at 27–28).

■ We conclude that specific performance may be precluded by impossibility of performance either at the time of breach or at the time that court relief is sought. The courts have long recognized that impossibility (or even impracticability) of performance at the time that performance was due may excuse enforcement of a contract if the impossibility was brought about by *force majeure*, or circumstances that were not caused by the party. *E.g., Restatement (Second) of Contracts* § 261

---

dence in question solely to demonstrate that it made efforts to mitigate its damages. Such a use of this evidence is consistent with the terms of the cited rule. *See Urico v. Parnell Oil Co.,* 708 F.2d 852, 854–55 (1st Cir.1983).

(1981); *Twin Holdings of Delaware LLC v. CW Capital, LLC,* 26 Misc.3d 1214(A), 2010 WL 309022, *6–7 (Sup.Ct. Nassau County Jan. 19, 2010). *See also Restatement (First) of Contracts* § 368 cmt. a (1932). In such a case, the court will read into the contract a clause excusing performance if an essential element to the contract ceases to be available prior to the time at which performance is due absent the fault of either party. *See generally Texas Co. v. Hogarth Shipping Corp.,* 256 U.S. 619, 629–31, 41 S.Ct. 612, 65 L.Ed. 1123 (1921); *W.K. Ewing Co. v. New York State Teachers' Ret. Sys.,* 14 A.D.2d 113, 115–16, 218 N.Y.S.2d 253, 255–56 (3d Dep't 1961). In those circumstances, the aggrieved party cannot establish the existence of an enforceable contract at the time that performance was due, and therefore the remedy of specific performance will not be available to it.

■■■ It is equally the case, however, that if a party cannot perform at the time of the application for specific performance, that fact will preclude the grant of specific performance. *See Restatement (Second) of Contracts* § 357 cmt. c (1981) ("[A] court will not order a performance that is impossible.") As the New York Court of Appeals has made plain, a court should not order specific performance, or other equitable relief, unless the defendant is capable of complying: "The court will not make what may prove to be a futile order." *S.E.S. Imps., Inc. v. Pappalardo,* 53 N.Y.2d 455, 464, 442 N.Y.S.2d 453, 458, 425 N.E.2d 841 (1981).

■■■ As we have observed, there is no question on the current record that defendant was able to perform as of May 30, 2008. As for whether it is now unable to do so, its bare proffer to that effect plainly does not justify a determination, as a matter of law, that specific performance is unwarranted. Indeed, defendant's financial status is likely to be a fairly complex matter to unearth, and it makes no effort whatsoever to justify its bare contention other than by allusion to cash or equivalents on hand and the amount of its debt, and the conclusory assertion by Mr. Sapir that the company cannot perform. Moreover, and most strikingly, Mr. Sapir's representation is seemingly in direct conflict with testimony that he gave at his deposition less than two months prior to his execution of his July 30, 2009 supplemental declaration; at that deposition, he testified that Sapir could still close the sale if it wanted to do so. (O'Connor Decl., Ex. 2 at 135–36). In short, the record does not remotely justify Rule 56 relief for defendant on this aspect of plaintiff's case based on impossibility or impracticability. *See, e.g., Meisels v. 1295 Union Equities Corp.,* 306 A.D.2d 144, 145, 761 N.Y.S.2d 48, 48–49 (1st Dep't 2003) ("Volitional unwillingness, as distinguished from good faith inability, to meet contractual obligations" is no defense against specific performance); *Restatement (Second) of Contracts* § 261 cmt. d (1981) (impracticability defense does not apply if event preventing performance is caused by obligee).

■■■ There remains for consideration whether plaintiff has itself adequately justified, as a matter of law, the appropriateness of equitable relief. For the reasons that we have noted, the record reflects that a remedy at law, in the form of damages, is not likely to be adequate because of the undisputed circumstances that render any attempt to value Edge Group's interest at the time of defendant's breach mere speculation. That interest was in an unlisted limited-liability company for which there was no apparent market at the time. Moreover, it appears that valuation of plaintiff's interest was in any event likely to be highly chancy since the company was restricted in its ability to sell its interest in the LLC, and the ability to

value that interest was further clouded by the facts (1) that the LLC had an interest only in another LLC (also apparently not publicly or actively traded), (2) that that LLC's value was contingent on the valuation of the undeveloped Las Vegas parcel in which it had a tenancy-in-common with a number of other entities and for which there was no apparent market during the relevant time, and (3) that that LLC was significantly restricted in its ability to transfer its interest in the tenancy-in-common to another entity. In short, specific performance appears amply justified provided that Sapir is capable of complying with such an order or that any incapacity to do so is attributable to its own deliberate actions designed to frustrate relief in this case.[9]

Defendant's showing on impossibility of performance is at best thin to evanescent. Moreover, insofar as it relies solely on the declaration of Alex Sapir, it runs into the well-established rule in this circuit that a party may not evade summary judgment by proffering an affidavit (or declaration) that directly contradicts the affiant's prior deposition testimony. *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 104 (2d Cir.2010) (citing *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 454–55 (2d Cir.1999) (citing

*Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996)). On its face Mr. Sapir's declaration appears to do precisely that. The only possible way to avoid that conclusion would be if defendant could demonstrate that between the time of Mr. Sapir's deposition on June 4, 2009 and the date of the execution of his supplemental declaration on July 30, 2009 some new event occurred that so altered Sapir's financial position as to fundamentally undermine its conceded ability in June 2009 to pay $20 million to acquire Edge Group's interest in WAICCS 2.

Because that question is not answered on the current record, we are prepared to conduct a brief evidentiary hearing on that narrow issue in the event that Sapir can offer competent evidence in support of the notion that its financial status materially changed between June 4 and July 30, 2009 so as preclude its ability to perform its obligations under the Option Agreement as amended. Absent Sapir's ability to make such a showing—and subject to our ruling below regarding the purported preclusive effect of the escrow provision of the Option Agreement—we conclude that Edge Group has established the appropriateness of the equitable remedy of specific performance for Sapir's breach.

---

**9.** As with all equitable remedies the court is required to balance the harm to the plaintiff from denying relief against any notable harm to the defendant from granting relief. *See, e.g., Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430, 433 (2d Cir.1993). We have noted the difficulty of assessing the value of plaintiff's interest in WAICCS 2, and further note that defendant has made no showing of undue hardship from complying with an order for specific performance other than its current and highly suspect claim of financial inability. To the extent that there is any question about the impact of such an order, we are giving Sapir the opportunity to demonstrate undue financial burden. *See* text at

p. 36, *infra.* At present, however, the harm to Edge Group from being stuck with an apparently unsaleable interest in an apparently unsaleable parcel appears to outweigh any legitimate interest that Sapir might have in not having to perform under the contract. This harm has been compounded by Sapir twice compelling Edge Group to remove its interest from the market in anticipation of a closing that Sapir cancelled at the eleventh hour. Such a scenario justifies an award of specific performance. *See Leasco Corp.*, 473 F.2d at 786 ("When a buyer's conduct makes it difficult if not impossible for a seller to dispose of the property elsewhere, specific performance is proper relief.").

2. *Liquidated Damages as Precluding Other Remedies*

We next turn to the question of whether—as defendant contends in its summary-judgment motion—Edge Group's entitlement to specific performance under general equitable principles is precluded by the existence of a liquidated-damages clause in the amended Option Agreement. We conclude that even if the amended Agreement is interpreted to include a liquidated-damages provision, it does not prevent Edge Group from obtaining equitable relief in the form of specific performance of the contract.

As the New York Court of Appeals has long held, "when parties set down their agreement in a clear, complete document, their writing should ... be enforced according to its terms." *TAG 380, LLC v. ComMet 380, Inc.*, 10 N.Y.3d 507, 512–13, 860 N.Y.S.2d 433, 436, 890 N.E.2d 195 (2008) (internal quotation marks omitted); *accord W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443, 566 N.E.2d 639 (1990). *See also R/S Assocs. v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 360, 771 N.E.2d 240 (2002). In short, if "the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law and the case is ripe for summary judgment." *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *leave denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611, 572 N.E.2d 52 (1991).

In support of its motion, Sapir argues that the provision in the amended Agreement that requires an escrow deposit and then specifies what disposition is to be made of that deposit in four different scenarios amounts to a liquidated-damage provision insofar as it specifies that the deposit is to be paid to Edge Group in the event of a breach by Sapir. Defendant further argues that this provision also precludes any other remedy by Edge Group for such a breach, including specific performance. Even if we assumed *arguendo* that the cited language amounts to a liquidated-damages provision, defendant's ultimate argument that this provision represents the full extent of plaintiff's available relief would be indefensible.

■ As the Second Circuit recently observed, the New York courts "appear willing, at least in some circumstances, to recognize limitations on available remedies, but they do so only when the contract 'contains a clause specifically setting forth the remedies available to the buyer if the seller is unable to satisfy a stated condition.' " *Vacold LLC v. Cerami*, 545 F.3d 114, 130 (2d Cir.2008) (quoting *101123 LLC v. Solis Realty LLC*, 23 A.D.3d 107, 108, 801 N.Y.S.2d 31, 31–32 (1st Dep't 2005)). The cited proposition—which is plainly not limited to purchaser—plaintiffs, *see e.g.*, *Rubinstein v. Rubinstein*, 23 N.Y.2d 293, 297, 296 N.Y.S.2d 354, 358, 244 N.E.2d 49 (1968) (rejecting exclusion of specific performance in favor of party seeking to compel defendant, *inter alia*, to perform his contractual obligation to buy plaintiff's interest in a jointly-held corporation)—requires that, to preclude an injured party's resort to specific performance, the contract on its face must make clear that the damaged party is limited to specifically identified remedies. *E.g.*, *Vacold LLC*, 545 F.3d at 130–31; *Rubinstein*, 23 N.Y.2d at 297–300, 296 N.Y.S.2d at 358–60, 244 N.E.2d 49; *Papa Gino's of Am., Inc. v. Plaza at Latham Assocs.*, 135 A.D.2d 74, 76, 524 N.Y.S.2d 536, 538 (3d Dep't 1988).

*Vacold* is particularly instructive in this respect. In the course of defending against a securities fraud claim, defendant Cerami ("CCC") asserted that an agreement that it had made with Vacold's predecessor (Immunotherapy) to purchase certain shares of stock was binding on the

parties as of the date of that agreement, and that CCC was therefore not subject to further disclosure obligations. On appeal the circuit court rejected the notion, pressed by Vacold, that there was no binding agreement for the transfer of stock because CCC would have been prevented from seeking specific performance of the contract by a provision that described one step that must be jointly taken by the contracting parties in the event of a breach. *See Vacold LLC,* 545 F.3d at 129–31.[10] As the Court observed:

> [T]o the extent that paragraph 7 . . . has any effect at all on the remedies available to either party, it is no more than a provision that would liquidate damages if Immunotherapy refused to tender its shares. It cannot, however, be a limitation of liability that would preclude specific performance or create a unilateral option for Immunotherapy. Although a liquidated damages provision precludes a party from recovering lost profits and other measures of *damages,* . . . it does not prevent a party from seeking specific performance, absent an express provision to this effect.

*Id.* at 130 (citing cases) (emphasis in original). To similar effect, *see Rubinstein,* 23 N.Y.2d at 298, 296 N.Y.S.2d at 358, 244 N.E.2d 49 ("For there to be a complete bar to equitable relief there must be something more [than a liquidated damages clause alone], such as explicit language in the contract that the liquidated damages provision was to be the sole remedy."). As the *Vacold* court noted, in the wake of

*Rubinstein* the New York courts do not imply a preclusion of equitable remedies absent specific contractual language to that effect. 545 F.3d at 130–31 (also citing *Papa Gino's of Am., Inc.,* 135 A.D.2d at 76, 524 N.Y.S.2d at 538 ("[A] liquidated damages clause does not bar the equitable relief of specific performance unless there is explicit language that it is to be the sole remedy for a breach.")). *Accord, e.g., Granite Broadway Dev. LLC v. 1711 LLC,* 44 A.D.3d 594, 594–95, 845 N.Y.S.2d 10, 11 (1st Dep't 2007) (affirming award of liquidated damages and specific performance and noting that "a provision extinguishing rights or obligations will not be implied absent clear and express language to that effect"); *Coizza v. 164–50 Crossbay Realty Corp.,* 37 A.D.3d 640, 643, 831 N.Y.S.2d 433, 436 (2d Dep't 2007) (holding that language of contract did not limit plaintiff's recovery to liquidated damages); *Barclay Arms Assocs. v. Clemente,* 98 A.D.2d 892, 893, 470 N.Y.S.2d 881, 881 (3d Dep't 1983) (affirming award of specific performance and noting that a liquidated-damages clause "does not bar the equitable relief of specific performance unless there is explicit language that liquidated damages are to be the sole remedy for the breach"). *See also Restatement (Second) of Contracts* § 361 (1981).[11]

■ In the present case, defendant's contention that plaintiff is barred by the amended Option Agreement from seeking specific performance plainly fails because the contract contains not a shred of language that might suggest, much less ex-

---

**10.** The cited provision in paragraph 7 of the contract stated that "[CCC] and Immuno[therapy] agree to split the use of the Virtual Lymph Node technology in humans in the event and *only* in the event [CCC] or its affiliate does not purchase the AVT shares from Immuno[therapy] as provided in this letter, unless such failure to purchase is caused by Immuno[therapy's] refusal to comply with the provisions of this letter." *Id.* at 129 (emphasis in original).

**11.** Defendant seeks to distinguish *Vacold* and *Rubinstein,* and virtually all other decisions cited by plaintiff. (*E.g.,* Def.'s Memo in Opp'n at 12–16). It fails to do so because it cannot demonstrate that any of the factual differences that it cites were material to the various courts' legal analyses.

plicitly provide, that receipt of the one-million dollar deposit was plaintiff's only available remedy. Indeed, the wording of the amended Agreement plainly does not so limit Edge Group.

The provision that Sapir cites is, on its face, addressed solely to the handling of the deposit in a variety of scenarios, including in the case of a breach by the buyer. It does not otherwise address remedies. Moreover, Sapir's reading of this provision would have an obviously perverse effect. Under its terms, if Sapir did not exercise the option, Edge Group was to receive the deposit. If, however, Sapir exercised the option and then breached, the result would be the same—plaintiff would receive only the deposit. In short, under this reading, plaintiff would have no remedy for a breach since there would be no consequence for Sapir's disavowal of its contractual obligations beyond what would happen if Sapir simply had not exercised the option and thus had never breached. That result, in effect an option on an option (or, as the court in *Vacold* described it, a "unilateral option", 545 F.3d at 130), would eviscerate the contractual requirement that, by a specified date, the option holder either bind itself to a contract to purchase or see the option expire.[12]

Apart from the evident implausibility of a seller unilaterally binding itself not to offer the property for a period of time beyond the election date in exchange for no consideration, this reading runs afoul of

the well-recognized principle that contracts are to be interpreted to give meaning to all of their terms. *See, e.g., Mionis v. Bank Julius Baer & Co.,* 301 A.D.2d 104, 109, 749 N.Y.S.2d 497, 502 (1st Dep't 2002) (citing, *inter alia, Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961)). Under Sapir's interpretation, the deadline for exercise of the option would be meaningless because the exercise itself would have no consequence. In effect, the deadline to decide whether to exercise the option would be the day of the closing, not the contractual deadline of May 1, 2008.

Sapir's reading fails for still another reason. The original Call Option Agreement between Edge Group and Credit Suisse provided in Article III that "[a]ll rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available." (O'Connor Decl., Ex. 1 at § 3.10). This provision plainly contemplated that any remedies specified in the Agreement were not exclusive, that is, they would not preclude the availability of any other remedies offered under governing contract or otherwise applicable law. Notably, when the parties entered into the amendment that required the deposit by Sapir—the provision on which defendant relies to claim an exclusivity of remedy—they provided explicitly that the terms of Article III of the Option Agreement "shall apply to, and are hereby incorporated with, this

---

12. We reject Sapir's suggestion that the one-million-dollar escrow deposit could not have functioned as compensation for the extension of the option-exercise period, as Edge Group contends, because (1) the escrowed funds were to be deducted from the $20 million purchase price at closing, (2) the escrowed funds were not available to Edge Group as of February 15, 2008, the date on which the option exercise period was extended, and (3) the funds were deposited into escrow instead of being paid directly to Edge Group. (Def.'s

Reply Mem. at 9 n. 9). As Sapir itself acknowledges, none of these terms are inconsistent with the notion that the deposit was made to induce Edge Group to extend the duration of the option period. (*Id.*). Moreover, even if Sapir establishes that the deposit was intended to function as liquidated damages, that fact does not establish that Edge Group was precluded from seeking additional remedies for Sapir's breach, as Sapir must show to establish that Edge Group is not entitled to specific performance.

letter, *mutatis mutandis*." (*Id.*, Ex. 13 at 2). In short, the non-exclusivity proviso from the original Agreement applies to the contract as amended, and specifically precludes any argument that the amendment had the effect of limiting plaintiff to the deposit as its sole remedy for a breach.[13]

In seeking to avoid this result, defendant invokes the deposition testimony of two witnesses, both from Credit Suisse, who apparently served as intermediaries between Edge Group and Sapir in negotiating the assignment of the option and the terms of the amended Agreement. According to defendant, their testimony reflects the substance of negotiations concerning the role of the required deposit and supposedly supports defendant's interpretation. Sapir's argument is meritless.

■■■■■ Putting to one side what the testimony actually shows, it is not admissible to vary the contract, which is, for reasons noted, unambiguous with regard to whether Edge Group is limited to recovery of the deposit as its sole remedy for a

breach by Sapir. A contract is ambiguous only if reasonable triers of fact could disagree about the meaning of the pertinent language. *Capital Dist. Enters., LLC v. Windsor Dev. of Albany, Inc.*, 53 A.D.3d 767, 770, 861 N.Y.S.2d 816, 819 (3d Dep't 2008) (defining ambiguous contract provisions as ones that "provide a reasonable basis for a difference of opinion"). Given the New York courts' requirement that any contractual limitation of remedies must be explicit, it is evident that the pertinent language cannot be read to impose such remedial exclusivity on Edge Group.[14] Moreover, even if we ignored the requirement of explicit language in that respect, the wording of the Agreement, as amended—including the guarantee of no limitation on remedies in section 3.10, the merger provision of section 3.07, and the absence of any justification for reading the amendment as excluding any remedy for a breach as opposed to non-exercise of the option—would dictate the same conclusion.

**13.** In arguing the contrary, Sapir asserts that the quoted language about remedies was meaningless in the context of the original Agreement, because that version of the contract did not itself specify any remedies. (Def.'s Mem. in Opp'n at 26). This argument, fails in its assessment of the original contract and is irrelevant in light of the terms of the amendment. In the original Agreement, the clause served to assure that plaintiff would have available to it the full range of remedies—legal and equitable—offered under governing law. Whether that provision was needed to accomplish such a result is inconsequential. In any event, the later amendment of the contract added the provision requiring a security deposit and went on to reaffirm the continuing effect of Article III of the original Agreement, including the provision explicitly precluding any limitation of remedies. In that circumstance, the absence of any specification of remedies in the pre-existing contract is simply immaterial.

**14.** To the extent that Sapir relies on the *Rubinstein* court's consideration of the "sur-

rounding circumstances" to determine the preclusive effect of the liquidated-damages clause at issue in that case to support consideration of the cited deposition testimony, we reject its argument. (*E.g.*, Def.'s Mem. in Opp'n at 19–22). We note that the *Rubinstein* court was following an 1887 Court of Appeals case which stated that the parties' intention as to the preclusive effect of such a clause was to be determined by " 'the whole instrument and the circumstances.' " *Rubinstein*, 23 N.Y.2d at 298, 296 N.Y.S.2d at 359, 244 N.E.2d 49 (quoting *Diamond Match Co. v. Roeber*, 106 N.Y. 473, 13 N.E. 419, 424 (1887)). However, New York courts now limit the introduction of parol, or extrinsic, evidence on the meaning of contractual provisions to situations in which the written terms of the contract are unclear or ambiguous. *See, e.g., Fernandez v. Price*, 63 A.D.3d 672, 675, 880 N.Y.S.2d 169, 172–73 (2d Dep't 2009); *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 61 A.D.3d 614, 615–16, 878 N.Y.S.2d 717, 719 (1st Dep't 2009).

In any event, the deposition testimony cited by Sapir, even if admissible on the current motion, would not justify the conclusion sought by defendant. The two witnesses, Messrs. Anthony Orso and Lawrence Britvan, apparently participated in the negotiation of the terms between Edge Group and Sapir, whose representatives apparently never dealt directly with each other. (Def.'s Mem. in Supp. at 10–11 & n. 6; Silber Decl. at ¶ 27). Of the two witnesses, however, one—Mr. Britvan—testified that the deposit was intended as compensation to Edge Group for extending the deadline for the exercise of the option when it was assigned from Credit Suisse to Sapir and that there was no discussion of the deposit being a cap on the relief available to Edge in case of a breach. (O'Connor Decl., Ex. 14 at 23; O'Connor Supplemental Decl., Ex. 8 at 26–28). That reading, which is consistent with the provision as written—the deposit was to be paid to Edge even if Sapir did not exercise the option—does not accord with the notion that it was also a remedy (and indeed the sole remedy) in the event that Sapir exercised the option and then breached. In fact, as noted, such a result would be virtually inexplicable since, once Sapir sent the exercise notice, the parties were bound to a contract for purchase and sale, thus obligating Edge Group to perform. If so, it can scarcely be the case that it alone would have to perform—or face potential contractual claims and damages—while Sapir was free to breach with no further penalty.

As for the testimony of the other witness, Mr. Orso, it offers no meaningful support for defendant's contentions in this case. He does not specify any communications that he received from either side to pass on to the other; rather, in substance all that he says is (1) that he told Sapir's representative, Alex Sapir, that if defendant breached, the only remedy would be payment of the million dollars, and (2) that

it was his "understanding, based on [his] conversations with Reagan [the Edge Group representative] and with Alex, that the million dollars would be the only form of compensation should Sapir not close." (O'Connor Supplemental Decl., Ex. 7 at 89).

 Whatever may have been Mr. Orso's understanding or assumption, unless Edge Group communicated its agreement to that position, Orso's view—which is plainly inconsistent with the actual terms of the contract that was ultimately agreed to—is irrelevant. As for Orso's discussion with Sapir, whatever may have been its substance, Sapir ultimately signed an agreement that does not accord with Orso's stated assumption; hence, even if Alex Sapir thought this item was "very important" (O'Connor Supplemental Decl., Ex. 7 at 89)—an observation by Orso that is inadmissible since it is incompetent testimony—he ultimately signed an agreement that does not reflect what he supposedly thought was "very important", and he is bound by the unambiguous terms of the document that he ultimately signed. *See Angelino v. Freedus,* 69 A.D.3d 1203, 1205–06, 893 N.Y.S.2d 668, 670–71 (3d Dep't 2010); *New York Prop. Holding Corp. v. Rosa,* 26 A.D.3d 186, 186, 809 N.Y.S.2d 34, 35 (1st Dep't 2006). Finally, to the extent that Sapir seeks to use Orso's testimony to alter, vary or contradict the terms of the written contract, that effort fails in the face of the contractual merger provision. *See generally Jarecki v. Shung Moo Louie,* 95 N.Y.2d 665, 669, 722 N.Y.S.2d 784, 786, 745 N.E.2d 1006 (2001); *Primex Int'l Corp. v. Wal–Mart Stores, Inc.,* 89 N.Y.2d 594, 599–600, 657 N.Y.S.2d 385, 388, 679 N.E.2d 624 (1997).

In sum, there is no basis for defendant's contention that the Option Agreement as amended precluded a resort by Edge Group to specific performance. Hence this

aspect of defendant's summary-judgment motion is denied, Moreover, since the terms pertinent to that conclusion dictate the opposite result, the equivalent portion of plaintiff's summary-judgment motion— rejecting the limitation-of-remedies defense—is granted.

## CONCLUSION

For the reasons noted, we grant in part plaintiff's motion for summary judgment, leaving for trial solely the questions of whether defendant is able to perform and, if not, whether that inability is attributable to defendant's own deliberate conduct. As to those issues, we will schedule a hearing. To do so, we direct that counsel appear for a pre-trial conference on April 8, 2010 at 10:00 a.m. in Courtroom 17D, 500 Pearl Street, New York, New York 10007.