10 N.Y.3d 507 (2008)
890 N.E.2d 195
860 N.Y.S.2d 433
TAG 380, LLC, Respondent,
v.
COMMET 380, INC., Appellant. (And a Third-Party Action.)
Court of Appeals of the State of New York.
Argued April 17, 2008.
Decided June 3, 2008.
*508 Seward & Kissel LLP, New York City (Bruce G. Paulsen, Jeffrey M. Dine and Benay L. Josselson of counsel), for appellant.
*509 Rosenberg & Estis, P.C., New York City (Warren A. Estis and Michael E. Feinstein of counsel), for respondent.
Chief Judge KAYE and Judges GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

OPINION OF THE COURT
CIPARICK, J.
In this appeal, we are asked to determine whether a long-term ground tenant breached its lease by obtaining insurance coverage expressly excluding "terrorism" where the lease required that the tenant maintain insurance coverage against *510 loss or damage by fire and other named perils included under the terms of the New York Standard Fire Insurance Policy and Extended Coverage Endorsement in effect in 1989. We conclude that the lease required tenant to procure insurance covering the named perils without excluding "terrorism" as an underlying cause of the named peril and that, by failing to do so, the tenant breached its lease.

I.
The dispute in this case arose in the aftermath of the September 11, 2001 terrorist attacks, just prior to the enactment of the Terrorism Risk Insurance Act of 2002 (15 USC § 6701 Note).[1] During this time, it became the practice of insurance companies that provided coverage for large commercial properties in New York City to raise their premiums for policies covering potential damage caused by terrorists, or to exclude from coverage altogether all damage from terrorist acts (see 1 Kalis, Reiter, Segerdahl, Policyholder's Guide to the Law of Insurance Coverage § 13.07 [B] [15], at 13-62 [2008 Supp], and vol 2, § 28.01, at 28-3 [2005 Supp]).
Defendant, ComMet 380, Inc., a corporate real estate investment trust, is the fee owner of a commercial building at 380 Madison Avenue, in New York City. Plaintiff, TAG 380, LLC, a limited liability company managed by real estate developer Sheldon H. Solow, is the tenant of that property under a master ground lease. Both parties are successors to a 25-year lease, which became effective on January 27, 1989 and is scheduled to expire on January 26, 2014.
Section 6.01 (a) of the lease requires tenant to "keep and maintain" insurance for the value of the building "against loss or damage by fire and against loss or damage by other risks included under the standard Extended Coverage Endorsement as presently adopted for use with the New York Standard Fire Insurance Policy, in an amount not less than the then full insurable value of the Building" (see Insurance Law § 3404).[2] The Extended Coverage Endorsement in effect in 1989 obligates the *511 lessee to provide full insurance for certain other named perils, including windstorm, hail, smoke, riot, civil commotion, explosion and physical contact with the building by an aircraft or vehicle, and specifically excludes from coverage damage to the building caused by, among other things, various water disasters and hostile or warlike action by sovereign nations or their agents. Section 6.03 of the lease requires that lessee furnish the owner with proof in the form of a "certificate or a duplicate original of such policy" not less than 30 days prior to the expiration of its current insurance policy.
On June 30, 2002, TAG's insurance policywhich provided for a blanket coverage against all losses without excluding terrorismexpired. A month earlier, ComMet had written to TAG, reminding it of the impending expiration date. Before the expiration date, TAG obtained a one-year, all-risk policy that covered all causes of damage, as before, but it specifically exempted from coverage all losses incurred as a result of terrorism. The policy further contained an exclusions section, entitled the "War Risk and Terrorist Exclusion," which disclaimed any action caused even remotely "by terrorism." Indeed, the new policy explicitly stated "TERRORISM IS EXCLUDED."
On August 5, 2002, TAG advised ComMet that it had purchased terrorism insurance valued at $100 million. ComMet asserted that this coverage amount was inadequate, claiming that the insurable value of the building was approximately $400 million. The same day, ComMet sent a notice of default to TAG, asserting that it had not complied with the terms of the lease. That notice, pursuant to section 11.01 of the lease, initiated a 10-business-day cure period, in which TAG could avoid default by obtaining the required insurance coverage. During this period, TAG did not provide any proof of even the alleged $100 million coverage as required by the terms of the lease.
At about the same time, unbeknownst to ComMet, Solow Management purchased an additional one-year, $300 million terrorism insurance coverage for its properties, including coverage for 380 Madison Avenue. Thereafter, TAG has maintained an all-risk policy covering damage caused by terrorism. It was not until February 19, 2003, after the commencement of this action, however, that TAG provided ComMet with evidence of its $100 million terrorist insurance coverage, and later, on May 23, 2003, when faced with a subpoena, TAG finally disclosed the other $300 million terrorist insurance policy.
*512 In the interim, in August 2002, TAG commenced this action by moving for a declaratory judgment and a Yellowstone injunction (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630 [1968]). ComMet counterclaimed for breach of contract damages, a declaratory judgment and attorneys' fees.[3] On October 28, 2002, Supreme Court granted the Yellowstone injunction, which prohibited ComMet from terminating TAG's lease pending the outcome of this action and tolled the cure period in the default notice. Thereafter, ComMet moved for summary judgment on its counterclaims. Supreme Court granted ComMet summary judgment, holding that TAG breached its lease agreement, declaring that TAG "ha[d] a duty under Section 6.01 of the Lease to obtain insurance . . . which does not exclude coverage for terrorism" (2005 NY Slip Op 30271[U], at *8) and awarding damages and attorneys' fees.
The Appellate Division modified Supreme Court's decision insofar as appealed from by declaring that TAG had no duty under the lease to maintain terrorism insurance, and reversed the awards of damages and attorneys' fees.[4] We granted ComMet leave to appeal, and now modify the Appellate Division order by reinstating the judgment of Supreme Court.

II.
When interpreting an insurance clause, we have repeatedly stated that it is for the court to determine the parties' rights and obligations under an insurance policy based on the specific language of the policy (see Newin Corp. v Hartford Acc. & Indem. Co., 62 NY2d 916, 919 [1984]; Hartford Acc. & Indem. Co. v Wesolowski, 33 NY2d 169, 172 [1973]). Similarly, it is a basic contract principle that "when parties set down their agreement in a clear, complete document, their writing should . . . be *513 enforced according to its terms" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004], quoting W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]; see also Reiss v Financial Performance Corp., 97 NY2d 195, 198 [2001]). "We have also emphasized this rule's special import `in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length'" (Vermont Teddy Bear Co., 1 NY3d at 475, quoting Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995]).
Commercial property insurance is generally offered in either an all-risk policy or a named-perils policy (see Parks Real Estate Purch. Group v St. Paul Fire & Mar. Ins. Co., 472 F3d 33, 41 [2d Cir 2006]). "Named-perils" covers only specifically enumerated risks, whereas an "all-risk" agreement generally covers all risks of physical loss, except for those perils specifically excluded. Those losses caused by fraud or, in some cases, by a fortuitous and unforeseen event are likewise excluded (see 7 Couch on Insurance 3d § 101:7). TAG was required to obtain only a "named-perils" policy to provide coverage for fire and the specifically named-perils in the Standard Fire Insurance Policy and Extended Coverage Endorsement. It is undisputed that the lease here is silent as to whether it includes or excludes acts of terrorism.[5]
Under section 6.01 (a) of the lease, TAG was required to maintain insurance for the building against fire and loss or damage by other risks under the Standard Fire Insurance Policy and Extended Coverage Endorsement, covering windstorm, hail, smoke, riot, civil commotion, explosion and physical contact with the building by an aircraft or vehicle, irrespective of whether the mechanism of loss was the result of a terrorist act. The Standard Fire Insurance Policy, as set forth in Insurance Law § 3404 (e), provides that the insuring party must protect against all direct loss by fire and lightning, and provides for other minimum requirements for standard fire insurance policies *514 (see Lane v Security Mut. Ins. Co., 96 NY2d 1 [2001]). Thus, fire insurance policies must contain "terms and provisions no less favorable to the insured than those contained in the standard fire policy" (Insurance Law § 3404 [f] [1] [A]). If a policy contains a less favorable term, it "is enforceable as if it conformed with the statutory standard" (1303 Webster Ave. Realty Corp. v Great Am. Surplus Lines Ins. Co., 63 NY2d 227, 231 [1984]).
In June 2002, TAG obtained insurance specifically excluding any damages caused by terrorism. TAG's insurance policy states "TERRORISM IS EXCLUDED," and it defines a "Terrorist purpose" as: "the use or threatened use of any unlawful means, including the use of force or violence." The exclusions clause additionally provides that TAG's insurance does not cover any peril caused by terrorists: "whether such loss or damage is accidental or intentional, intended or unintended, direct or indirect, proximate or remote or in whole or in part caused by, contributed to or aggravated by any perils insured by the policy."
ComMet contends that "terrorism" includes actions taken by individuals who may use any of the enumerated perils to cause damage to the building. TAG, on the other hand, contends that the insurance it procured provided coverage for any of the named perils and thus it met its obligations under the lease, even though its policy excluded "terrorism." TAG is mistaken.
TAG's insurance violated Insurance Law § 3404. In Lane v Security Mut. Ins. Co. (96 NY2d 1 [2001]), we held that a fire insurance policy that excludes coverage for an intentional fire set by "an insured" violates Insurance Law § 3404. In that case, the plaintiff insured's son, a stranger to the policy, damaged the insured premises by setting it on fire. We held that the insurer violated the Insurance Law by providing less coverage than the minimum level of coverage for fire insurance provided in the standard policy, because it disallowed coverage for a third party intentionally using fire to cause damage to the building. The same reasoning can be applied here too, where terrorists may cause fire damage to a building. We reject TAG's contention that because terrorism is not specifically mentioned as a named peril, it is outside of the coverage.
TAG's policy also failed to meet its coverage obligations under the lease. "Terrorism" is commonly defined as "[t]he use or threat of violence to intimidate or cause panic, [especially] as a *515 means of affecting political conduct" (see Black's Law Dictionary 1512-1513 [8th ed 2004]). The term is not limited to a specific cause of harm (e.g. a fire, explosion, collision with an aircraft), but rather it can also describe individuals, with a common purpose, who may potentially utilize any of the lease's named perils to cause damage to the building. Thus, by purchasing a policy that excludes from coverage all methods potentially used by terrorists, including the named perils in the lease, TAG breached its lease.[6]
The remaining issues are (1) whether ComMet is entitled to damages for the amount of money it paid in insurance premiums for the purchase of the necessary coverage; and (2) whether it is entitled to attorneys' fees. Section 12.01 of the lease permits ComMet to make payments to remedy TAG's default at TAG's expense, immediately and without notice in the case of emergency. In the immediate period following September 11, 2001, terrorist actsagainst large Manhattan commercial buildings such as this onewere perceived threats. ComMet acted reasonably in procuring coverage to protect its ownership interests. The lease further required TAG to notify ComMet that it obtained adequate insurance 30 days prior to the lapse of its policy. It is undisputed that TAG eventually obtained insurance for $400 million for various properties, including the property here, but never disclosed nor furnished a copy of the policy until May 2003, many months after its previous policy had expired. By purchasing terrorist insurance, but failing to disclose that information to ComMet, TAG breached sections 6.03 and 6.05 of the lease agreement. Thus, ComMet must be reimbursed for any reasonable damages it incurred as a result of TAG's breach.
As to whether ComMet is entitled to attorneys' fees, generally, in a breach of contract case, a prevailing party may not collect attorneys' fees from the nonprevailing party unless such award is authorized by agreement between the parties, statute or court rule (see Hooper Assoc. v AGS Computers, 74 NY2d *516 487, 491 [1989]). Section 12.01 of the lease states: "bills for all costs, expenses and disbursements of every kind and nature whatsoever, including reasonable attorneys' fees, involved in. . . enforcing any right against Tenant, under or in connection with this Lease, or pursuant to law . . . shall be due and payable. . . ." Thus, Supreme Court's award of attorneys' fees was proper.
Accordingly, the order of the Appellate Division should be modified, without costs, by reinstating the judgment of Supreme Court and, as so modified, affirmed.
Order modified, etc.
NOTES
[1] Under this Act, the federal government and the insurance industry share the risk of loss from damage to commercial property and casualty loss arising from acts of terrorism.
[2] Insurance Law § 3404 (e) codified the New York Standard Fire Insurance Policy that insures against all "direct loss" caused by fire and lightning, and provides the "minimum level of coverage permissible" with respect to those perils (see Lane v Security Mut. Ins. Co., 96 NY2d 1, 5 [2001]).
[3] ComMet also counterclaimed for negligent misrepresentation and breach of the implied covenant of good faith and fair dealing. Such claims were rejected by both Supreme Court and the Appellate Division as duplicative of the breach of contract claim. We do not disturb that determination.
[4] Although not a subject of this appeal, ComMet additionally sued third-party defendant GMAC Commercial Mortgage Corporation (GMAC), its mortgage lender, for a declaration that (i) it is not obligated to purchase any insurances with respect to the property under the loan agreement and therefore is not in default thereunder; or (ii) that the loan agreement does not require ComMet to purchase terrorism insurance. GMAC counterclaimed by seeking a declaration, among others, that ComMet is required by the loan agreement to maintain terrorism insurance for the building. Supreme Court held that GMAC is entitled to a declaration that ComMet is required by the loan agreement to provide insurance for terrorism.
[5] The lease excludes some warlike activities by foreign actors, but it does not specifically disclaim all hostile actions by ad hoc paramilitary groups, such as al Qaeda. Thus, there is no issue that it is specifically tailored to address "terrorism" (see Pan Am. World Airways, Inc. v Aetna Cas. & Sur. Co., 505 F2d 989 [2d Cir 1974]; cf. Younis Bros. & Co. v CIGNA Worldwide Ins. Co., 899 F Supp 1385 [ED Pa 1995], affd 91 F3d 13 [3d Cir 1996]; see also 10A Couch on Insurance 3d § 152:18 ["the standard war exclusion does not explicitly extend to acts of terrorism"]).
[6] Although promulgated after TAG's purchase of the offending policy, the Superintendent of Insurance's pronouncement that terrorism exclusions are against the public policy of the State and barred under the Standard Fire Insurance Policy (see NY State Ins Dept Circular Letter No. 25, RE: Applicability, Guidelines and Procedures for Compliance with the Provisions of the Terrorism Risk Insurance Act of 2002; Guidelines for the Use of Limitations for Acts of Terrorism in Commercial Property/Casualty Policies [Dec. 23, 2002]) lends support to ComMet's argument that allowing the decision below to stand is inconsistent with New York's public policy.