[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-14560

_____

SOUTHERN COAL CORPORATION,
JAMES C. JUSTICE, II,

Plaintiff-Counter Defendants-Appellee-Cross Appellants,

*versus*

DRUMMOND COAL SALES, INC.,

Defendant-Counter Claimant-Appellant-Cross Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-01104-WMR

_____

Before WILSON, LAGOA, and ED CARNES, Circuit Judges.

WILSON, Circuit Judge:

Drummond Coal Sales, Inc.'s (Drummond) motion to amend this court's judgment is GRANTED. We vacate our prior opinion in this appeal, *Southern Coal Corporation v. Drummond Coal Sales, Inc.*, 25 F.4th 864 (11th Cir. 2022), and substitute for it this one. Accordingly, Southern Coal Corporation's (Southern Coal) petition for rehearing en banc of the now-vacated opinion is DENIED AS MOOT.

This appeal concerns a pricing dispute over a contract to transfer and store coal between plaintiff Southern Coal and defendant Drummond. The district court found Southern Coal breached the contract and awarded a judgment in favor of Drummond in the amount of $6,860,000 and $1,473,699.87 in prejudgment interest. Drummond appeals this judgment on the ground that the district court erred in finding a price escalation clause in the contract to be unenforceable. If this price escalation were enforceable, then Drummond would be entitled to even more damages under the contract for Southern Coal's breach. For its part, Southern Coal cross-appeals the district court's judgment, claiming that Drummond's actions excused Southern Coal's obligation to pay Drummond under the contract. Both parties challenge the district's court determination not to award attorneys' fees to either party.

We affirm the district court's judgment against Southern Coal in the amount of $6,860,000 plus $1,473,699.87 in prejudgment interest for a total of $8,333,699.87. The district correctly found that Southern Coal was not excused from performing under the contract. Further, the district court correctly found the price escalation clause unenforceable. However, we reverse on the issue of attorneys' fees and remand to the district court to award a reasonable sum to the prevailing party, Drummond.

## I.    BACKGROUND

The disputed contract in this case is called the Bulk Coal Transfer and Storage Agreement (Agreement). Southern Coal entered the four-year Agreement with Drummond in October 2013. Under the Agreement, Drummond would sublease port capacity located in Newport News, Virginia to Southern Coal. In exchange for Drummond's services under the Agreement, Southern Coal agreed to transfer through Drummond's port a minimum of 2 million metric tons of coal per year and pay Drummond a "minimum monthly Throughput Fee of $1,000,000." Southern Coal's then-president, James C. Justice II, contemporaneously executed a guarantee of Southern Coal's obligations under the Agreement.

Central to this dispute, § 6.14 of the Agreement provides that the base amount for the Throughput Fee would be adjusted upward based on increases in the "Peak Downs metallurgical benchmark price." "Peak Downs" refers to a mine in Australia owned by Australian mining company BHP Billiton (BHP). BHP is one of the leading coal exporters in Australia and produces high-

quality metallurgical coal. Metallurgical coal, often referred to as coking coal, is a primary component of steel manufacturing. As used here, "benchmark" refers to a negotiated price between mining companies and Asian steelmakers. Beginning in the 1980s, BHP would negotiate a yearly benchmark price for its high-quality metallurgical coal with Japanese steelmakers. This benchmark was published in industry newsletters and the price would serve as the market price of metallurgical coal for the year and other coal companies would use the benchmark in negotiating their own contracts.

For more than twenty years, BHP set the yearly benchmark price for metallurgical coal. Around 2008, BHP announced that it wanted to transition from a yearly negotiated benchmark price toward a quarterly, monthly, and eventually, a daily negotiated price. The last annually negotiated benchmark price was settled in 2009 and by the second quarter of 2010, the industry began using a quarterly benchmark price. When the parties entered the Agreement in 2013, the industry was still using a quarterly benchmark, routinely negotiated and set by BHP. However, by the fourth quarter of 2016, BHP moved away entirely from quarterly pricing, which resulted in the published quarterly benchmark price being set by other Australian coal producers.

Starting in the fourth quarter of 2013, Drummond began invoicing Southern Coal for the monthly Throughput Fee of $1 million. Initially, Southern Coal paid these invoices without issue. During this time, the price of metallurgical coal was relatively low

and the price escalation clause of the Agreement had consequently not been triggered. In the fourth quarter of 2016, however, the quarterly benchmark price of metallurgical coal, set by a company other than BHP, rose to $200 per metric ton. Drummond considered this price increase to trigger § 6.14 of the Agreement. Accordingly, Drummond sent Southern Coal an invoice on October 25, 2016 for $1,380,000, a figure which reflected a $380,000 increase in the minimum monthly Throughput Fee. Drummond invoiced Southern Coal for the same amount for November and December 2016.

In the first quarter of 2017, the quarterly benchmark price for metallurgical coal—as reported in industry publications—rose again to $285 per metric ton. Accordingly, Drummond sent Southern Coal an invoice on January 3, 2017, for $1,965,000, which included a $965,000 increase in the minimum monthly Throughput Fee. Southern Coal paid $1,000,000 of the invoice on February 6, 2017, but it refused to pay the remaining $965,000. After that payment, Southern Coal refused to pay any further invoices.

Southern Coal contested these invoices because it claimed that the "Peak Downs" benchmark to which § 6.14 of the Agreement referred ceased to exist as BHP was no longer setting the quarterly benchmark price. Therefore, there was no longer a mechanism for price adjustments under § 6.14 of the Agreement. Southern Coal sent a letter to Drummond on March 9, 2017, demanding adequate assurances that Drummond would not charge any increase to the Throughput Fee and would only charge the

minimum $1 million. Drummond sent a reply letter to Southern Coal asserting its right to increase the Throughput Fee because § 6.14 still applied regardless of which company set the quarterly benchmark, and that Southern Coal had no right to withhold payments.

Southern Coal sued Drummond and asserted claims for a declaratory judgment and breach of contract. Drummond asserted counterclaims against Southern Coal and Justice for declaratory judgment, breach of contract, and breach of a corresponding guarantee. Both parties moved for summary judgment. The district court found that § 6.14 of the Agreement was ambiguous and sent the issue of the meaning of the term "Peak Downs metallurgical benchmark price" to trial. However, the district court concluded that Southern Coal was still liable for the minimum monthly Throughput Fee of $1 million.

At a bench trial, the district court heard testimony from both parties on the meaning of the ambiguous term. Ultimately, the district court found that the term "Peak Downs metallurgical benchmark price" was intended by the parties to be, specifically, the quarterly price set by BHP for its coal that was mined from its Peak Downs mine and sold to Japanese steelmakers. The district court found the testimony of Dennis Steul, Drummond's vice president of sales and the primary negotiator of the terms of the Agreement, to be the more credible and persuasive evidence of the parties' intent. Accordingly, the district concluded that § 6.14 became unenforceable when BHP ceased setting the quarterly benchmark

price for metallurgical coal. However, because the Agreement contained a savings clause, the district court determined that the price escalation clause could be severed and the remainder of the Agreement was valid. As a result, the district court granted judgment in favor of Drummond in the amount of $6,860,000 against Southern Coal and Justice.

Drummond raises three purported errors of the district court on appeal: (1) evidence of industry usage establishes that § 6.14 is unambiguous and therefore extrinsic evidence of the parties' intent should not have been admitted in interpreting the Agreement; (2) instead of finding § 6.14 unenforceable, the Agreement should have been equitably reformed to reflect the parties' intentions; and (3) attorneys' fees should be awarded to Drummond as provided for in the Agreement. On the other hand, Southern Coal contends that the district court erred in not finding that Drummond's actions constituted anticipatory repudiation and material breach of the Agreement. It also argues that the guarantee should not be enforced against Justice.

## II.    DRUMMOND'S ISSUES ON APPEAL

### A.    *Ambiguity of the Agreement*

Drummond argues that the district court erroneously relied on extrinsic evidence of the parties' intent to interpret the Agreement because evidence of industry usage establishes that the Agreement is unambiguous. According to Drummond, the Agreement is unambiguous based on evidence of industry usage that

demonstrates there is only one quarterly benchmark for the price of metallurgical coal at any given time.  To everyone in the industry, the argument goes, the reference to the "Peak Downs metallurgical benchmark price" refers unequivocally to the one and only benchmark price.

The interpretation of a contract, including whether it is ambiguous, is a question of law that we review de novo.  *Reynolds v. Roberts*, 202 F.3d 1303, 1313 (11th Cir. 2000).  "Questions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic evidence of the parties' intent, such as precontract negotiations, to interpret the disputed term."  *Laws. Title Ins. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995).  If a contract is ambiguous "and the trial court must look to extrinsic evidence to determine the parties' intent, we review its findings of fact . . . as to the parties' intent for clear error."  *Reynolds*, 202 F.3d at 1313.

The parties agree that New York law applies to this dispute. Under New York law, "[i]n determining the obligations of parties to a contract, courts will first look to the express contract language used to give effect to the intention of the parties, and where the language of a contract is clear and unambiguous, the court will construe and discern that intent from the document itself as a matter of law."  *Williams v. Vill. of Endicott*, 936 N.Y.S.2d 759, 761 (N.Y. App. Div. 2012).  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  *W.W.W.*

20-14560                Opinion of the Court                    9

*Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Extrinsic evidence may be considered to determine the parties' intent if the contract is ambiguous. *Fattorusso v. RJR Mechanical, Inc.*, 16 N.Y.S.3d 844, 846 (N.Y. App. Div. 2015). But extrinsic evidence may not be used to create ambiguity in a contract that is "complete and clear and unambiguous upon its face." *W.W.W. Assocs.*, 566 N.E.2d at 642.

In the context of a specialized trade or business contract, "[c]ontract terms are considered ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d. Cir. 1997) (internal quotation marks omitted) (applying New York law). Conversely, "contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001) (alterations adopted) (applying New York law). However, it is possible that "even where a contract does not define a particular—and potentially ambiguous—term, a body of state law or an established custom fills in the gaps left by the drafters." *Hugo Boss*, 252 F.3d at 617. "Custom" may also refer to industry usage of a term. In fact, "[w]hen interpreting a state law contract . . . an

established definition provided by . . .industry usage will serve as a default rule, and that definition will control unless the parties explicitly indicate, on the face of their agreement, that the term is to have some other meaning." *Id.* at 617–18. Accordingly, by looking to evidence of industry usage, "a possible ambiguity may ultimately be proven to be illusory." *Id.* at 618.

As noted above, the threshold determination of whether a contract is ambiguous is a question of law that we review de novo. *Reynolds*, 202 F.3d at 1313. We conclude that the district court made no legal error when it determined the Agreement to be ambiguous. Contrary to Drummond's argument, the district court did consider evidence of industry usage of the term in ruling on summary judgment. In its order, the court specifically noted that although "coal industry publications referred to the agreed upon quarterly price using various terms such as the 'Peak Downs benchmark,' the 'Australian coking coal benchmark,' or simply 'the benchmark,' there is some evidence to show that it was understood in the coal industry that the various terms denoted the same thing." Ordinarily, courts are bound to the four corners of the contract in interpreting it, but there is an exception for evidence of industry usage or custom, and this evidence may be considered in determining whether a contract is ambiguous. *See Hugo Boss*, 252 F.3d at 617–18. Here, the district court properly considered extrinsic evidence of industry usage before deciding on ambiguity. However, the district found that the Agreement, when read as a whole to determine its purpose and intent, was ambiguous because both

parties had offered reasonable interpretations of the term. As a contract is ambiguous if "capable of more than one meaning when viewed objectively by a reasonably intelligent person," we conclude that the district court made the proper legal determination that the Agreement was ambiguous. *Lightfoot*, 110 F.3d at 906.

Once the district court determined that the Agreement was ambiguous, it could properly hear extrinsic evidence as to the parties' intent at trial. *Fattorusso*, 16 N.Y.S.3d at 846. The district court heard trial testimony from Dennis Steul, Drummond's primary negotiator on the Agreement, and Steve Doyle, an industry expert called by Drummond. Doyle's testimony demonstrated that there has always been only one benchmark in the metallurgical coal industry and that there were a variety of terms used to describe this benchmark. As factfinder, the district court simply found the testimony of Steul to be more credible and persuasive. Steul's testimony corroborated the finding that the term in the price escalation clause was intended by the parties to be, specifically, the quarterly price set by BHP for the coal from its Peak Downs mine that was sold to Japanese steelmakers. Steul testified that he always considered Peak Downs to be a reference to the mine owned by BHP. The district court was entitled to credit that testimony.

Even more convincing was Steul's testimony that in a contract with another customer, Drummond priced the contract based on the price of coal from another specific mine besides the Peak Downs mine. Furthermore, that contract contained language

stating that, if the price for that mine was unavailable, the parties would mutually agree to an alternative quarterly price basis. In the Agreement here, there was no language that gave the parties the right to use a different quarterly price for coal. The Agreement instead tied increases in price to the Peak Downs price, which Steul conceded was a reference to the mine owned by BHP. When BHP stopped setting a quarterly benchmark price, the district court concluded that the price escalation clause in the Agreement then became unenforceable.

When the district court considers extrinsic evidence of the parties' intent in interpreting an ambiguous contract, this presents a question of fact that we review for clear error. *Reynolds*, 202 F.3d at 1313. Here, the district court did not clearly err in crediting Southern Coal's position in interpreting the contract because the parties' testimony at trial and the facts of this case supported this interpretation. When the parties entered the Agreement, BHP was routinely setting a quarterly benchmark price—thus, the price escalation clause was tied to the Peak Downs benchmark. However, during the course of the Agreement, BHP stopped this practice. We therefore ask, if BHP is no longer setting a quarterly benchmark for its Peak Downs mine, then how can the price escalation clause remain enforceable? Drummond argues that this is made possible by changing the term "Peak Downs metallurgical benchmark price" to "the quarterly benchmark price as agreed by mining companies and Asian steel producers and as published in industry newsletters." However, if that is what the parties intended, why

did the parties, who are sophisticated and familiar with the industry, not write the Agreement to so read?  Regardless, the correct approach here was clear.  When BHP stopped setting the quarterly benchmark price, the Agreement became unenforceable. *See In re Licata*, 908 N.Y.S.2d 441, 442 (N.Y. App. Div. 2010) ("[W]here a contract's material terms are not reasonably definite, the contract is unenforceable.").  Accordingly, we conclude that the district court made no legal error in finding the Agreement ambiguous and further, its decision to find the price escalation clause unenforceable was not clearly erroneous.

## B.      *Equitable Reformation of the Agreement*

Next, Drummond argues that even if the contract is ambiguous, the Agreement should be reformed to reflect the parties' intentions.  We disagree.

Under the equitable reformation doctrine, "courts of equity will reform a written contract where, owing to *mutual mistake*, the language used therein did not fully or accurately express the agreement and intention of the parties." *Philippine Sugar Ests. Dev. Co. v. Gov't of Philippine Islands*, 247 U.S. 385, 389 (1918) (emphasis added).

Drummond argues that the mutual mistake here was that the parties thought that BHP always set the quarterly benchmark price, when in fact, prior to entering the Agreement, companies other than BHP had set the quarterly benchmark price.  However, this does not appear to be an issue of a mutual mistake, but rather

a lack of due diligence by these sophisticated parties before entering the Agreement. *See Thompson v. McQueeney*, 868 N.Y.S.2d 443, 447 (N.Y. App. Div. 2008) ("[W]ith a minimum degree of due diligence, defendants' mistake . . . would have been readily apparent."). Furthermore, the district court determined that the intent of the parties was that the price escalation clause was a specific reference to the Peak Downs mine. Therefore, we cannot say the Agreement does not "fully or accurately express the agreement and intention of the parties." *Phillipine Sugar Ests. Dev. Co.*, 247 U.S. at 389. At best, this was a unilateral mistake on the part of Drummond. The only apparent mutual mistake here was a poorly drafted contract. Therefore, Drummond's claim for equitable reformation fails.

## C.    Attorneys' Fees

Lastly, Drummond argues that the district court erred in denying its request for attorneys' fees. We agree.

We review the district court's denial of attorneys' fees for an abuse of discretion. *In re Trinity Indus., Inc.*, 876 F.2d 1485, 1496 (11th Cir. 1989). Under New York law, a prevailing party in a breach of contract case may not collect attorneys' fees and costs from the non-prevailing party unless such an award is authorized by the contract, statute, or court rule. *TAG 380, LLC v. ComMet 380, Inc.*, 890 N.E.2d 195, 201 (N.Y. 2008). In determining the prevailing party for purposes of awarding attorneys' fees, the court must consider "the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope." *Duane*

*Reade v. 405 Lexington, L.L.C.* 798 N.Y.S.2d 393, 394 (N.Y. App. Div. 2005). New York courts have also said that a prevailing party "must simply prevail on the central claims advanced, and receive substantial relief in consequence thereof." *Sykes v. RFD Third Ave. I Assocs., LLC*, 833 N.Y.S.2d 76, 77–78 (N.Y. App. Div. 2007).

The district court determined that since neither party was the "prevailing party" an award of attorneys' fees was inappropriate. While Drummond succeeded on its claim regarding the minimum Throughput Fees under the Agreement, Southern Coal succeeded on its claim regarding the escalated fees. Although Drummond's victory was not total because it did not obtain judgment for the escalated fees, its "central claim" was that Southern Coal breached the Agreement by failure to pay the monthly Throughput Fee. The district court entered judgment in favor of Drummond for $6.86 million based on Southern Coal's breach in this regard. This qualifies as "prevail[ing] on the central claims advanced." *See Sykes*, 833 N.Y.S.2d at 77–78. A litigant's success does not have to be total to be considered the prevailing party. *See Duane Reade*, 798 N.Y.S.2d at 394 ("That the landlord's success at trial was only partial does not negate the fact that it prevailed."). Therefore, we conclude that the district court abused its discretion

in not awarding attorneys' fees to Drummond because Drummond was the prevailing party.[1]

New York law states that "when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987) (applying New York law). Accordingly, we remand to the district court for a determination of whether the attorneys' fees Drummond requests are reasonable.

### III.    SOUTHERN COAL'S ISSUES ON CROSS-APPEAL

#### A.    *Anticipatory Repudiation*

On its appeal, Southern Coal argues that the district court erred in determining that Drummond's actions did not constitute an anticipatory repudiation. "An anticipatory breach of contract by a promisor is a repudiation of a contractual duty before the time fixed in the contract for . . . performance has arrived." *Princes Point LLC v. Muss Dev. LLC*, 87 N.E.3d 121, 124 (N.Y. 2017) (alteration adopted). An anticipatory breach of contract—also known as an anticipatory repudiation—can be shown through statements by the obligor to the obligee or an affirmative act by the obligor.

---

[1] In its brief, Southern Coal argues that it is the prevailing party for purposes of attorneys' fees. Because we conclude that Drummond is the prevailing party, Southern Coal's argument in this regard fails.

*Id.* "For an anticipatory repudiation to be deemed to have occurred, the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'" *Id.* New York courts have held that "a wrongful repudiation of the contract by one party before the time for performance entitles the nonrepudiating party to immediately claim damages for a total breach." *Id.* at 125. Whether a party commits anticipatory repudiation of a contract is a question of fact. *O' Connor v. Sleasman*, 788 N.Y.S.2d 518, 520 (N.Y. App. Div. 2005).

When the price of coal increased to $285 per metric ton in the first quarter of 2017, Southern Coal refused to pay its obligations under the Agreement because BHP was no longer setting a quarterly benchmark price and the price escalation was therefore invalid. Southern Coal sent a letter to this effect to Drummond in March 2017 and demanded adequate assurances that Drummond would not invoice more than the minimum $1 million per month. Drummond responded that the price escalation clause remained valid and it would continue to invoice Southern Coal based on the quarterly benchmark price set by other companies. According to Southern Coal, this response constituted anticipatory repudiation. Notably, however, Drummond's response stated, "Drummond's performance obligation is to provide Southern [Coal] with the throughput services, and there is no question regarding Drummond's ability to provide these services."

In its brief, Southern Coal cites to *IBM Credit Fin. Corp. v. Mazda Motor Mfg. (USA) Corp.*, where the New York court of

appeals held that a party's "insistence on an untenable interpretation of a key contractual provision, and refusal to perform otherwise, constituted an anticipatory breach of the contract." 706 N.E.2d 1186, 1187 (N.Y. 1998). Thus, anticipatory repudiation requires a refusal to perform under the contract. Here, Drummond's obligation under the Agreement was to provide throughput services for its port to Southern Coal. At no point did Drummond indicate that it would not perform that obligation. Therefore, there can be no anticipatory repudiation. Accordingly, Southern Coal's argument that the district court should have excused Southern Coal from owing anything under the Agreement based on anticipatory repudiation is without merit.

B.    *Material Breach*

Similar to its anticipatory repudiation argument, Southern Coal argues that the district court should have found that Drummond materially breached the Agreement and therefore Southern Coal was discharged of its contractual obligations. A breach of contract is material if it goes "to the root of the agreement between the parties." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (applying New York law). Further, "[a] party's obligation to perform under a contract is only excused where the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract" and the court must consider "the special purpose of the contract" in making this determination. *Id.*

The district court concluded that Southern Coal's material breach argument was "without merit." Southern Coal contends that the escalated invoices constitute material breach. The district court specifically noted that "[t]he fact that Southern Coal may not agree with the amount that Drummond invoiced does not mean that Drummond breached its duty to invoice as required under . . . the Agreement." We agree with the district court's determination that Drummond did not materially breach the Agreement. The "root" of the Agreement was that Drummond would provide throughput services to Southern Coal. At no point did Drummond indicate that it would not perform this obligation.

Our conclusion is consistent with the Second Restatement of Contracts' approach to determining whether a breach is material. The Restatement notes the following circumstances, among others, are significant in making this determination: (1) "the extent to which the party *failing to perform* or to offer to perform will suffer forfeiture;" (2) "the likelihood that the party *failing to perform* or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;" and (3) "the extent to which the behavior of the party *failing to perform* or to offer to perform comports with the standards of good faith and fair dealing." Restatement (Second) of Contracts § 241 (1981) (emphasis added). Thus, central to the material breach analysis is the party's failure to perform. Because Drummond continued to perform its obligations under the Agreement and because Drummond's breach in this case went to pricing, and not to the

Agreement's "special purpose" of providing throughput services, we cannot say that Drummond's breach in this regard was material. *Frank Felix Assocs., Ltd.*, 111 F.3d at 289. Accordingly, we conclude that Drummond did not materially breach the Agreement and Southern Coal was not thereby excused from performing its obligations under the Agreement.

## C.    *Justice's Liability under the Guarantee*

Lastly, Southern Coal argues that if the award against it is vacated, then the award against Justice must also be vacated. However, since we are affirming the district court's judgment against Southern Coal, we need not address this argument. Regarding the award of attorney fees, the guarantee agreement, signed by Justice, provides that he "agrees to pay all expenses, including, without limitation, all reasonable fees and expenses of outside counsel which may be paid or incurred by [Drummond] in enforcing or asserting any of their respective rights under this Guarantee." Therefore, the guarantee provides that Justice may also be liable for attorneys' fees incurred by Drummond. We conclude that the judgment against Justice stands and he is also liable for the additional award of attorneys' fees if Southern Coal is unable to pay Drummond for this obligation.

## IV.    CONCLUSION

In sum, we affirm the district court's judgment against Southern Coal and Justice in the amount of $6,860,000 plus $1,473,699.87 in prejudgment interest for a total of $8,333,699.87.

We conclude that the district court correctly found as a matter of law that the price escalation clause in the Agreement was ambiguous.  We further conclude that district court did not clearly err in interpreting this provision at trial and finding it unenforceable.  We also reject Drummond's claim of equitable reformation and Southern Coal's claims of anticipatory repudiation and material breach.  Lastly, we conclude that the district court erred in not awarding a reasonable sum of attorneys' fees to Drummond.  Therefore, we reverse on the issue of attorneys' fees and remand to the district court to determine a reasonable sum.

**AFFIRMED** in part, and **REVERSED** and **REMANDED** in part.

20-14560          ED CARNES, J., Concurring          1

ED CARNES, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the panel's judgment and most of its opinion, including the conclusion that Drummond is entitled to a reasonable amount of attorney's fees. But I disagree about why Drummond is entitled to them.

Unlike the majority opinion, I don't think a prevailing party analysis is the right attorney's fees framework. The parties' agreement calls for a different framework, and under New York law that choice should be honored. The agreement provides that the "Defaulting Party shall indemnify the Non-Defaulting Party for any expenses and costs, including attorney fees, arising out of or relating to any default under this Agreement or any effort to collect payment." And it defines a "Defaulting Party" as a party who, among other things, "fails to make a payment as required under this Agreement."

Those contract terms matter because when considering whether to award attorney's fees in a contract dispute, New York courts generally follow the terms of the contract. Admittedly, the caselaw is not crystal clear, but the courts of that state don't appear to apply a prevailing party analysis where the contract provides otherwise. Instead, they apply a "defaulting party" analysis when the terms of the contract call for it and a "prevailing party" analysis when the terms of the contract call for that.

2                    ED CARNES, J., Concurring                    20-14560

New York decisions have addressed contracts with "defaulting party" language that is similar to the language used in the agreement in this case. Those decisions have awarded attorney's fees based on whether a party "defaulted" instead of whether a party "prevailed." *See Violet Realty, Inc. v. Amigone, Sanchez & Mattrey, LLP*, 183 A.D.3d 1278, 1280–81 (N.Y. App. Div. 2020) ("The lease provided that, in the case of a default, the defaulting party is liable for the payment of, among other things, the other party's reasonable attorneys' fees. Defendant does not dispute that it defaulted under the lease, and we conclude that the court should have granted that part of plaintiff's motion seeking an award of attorneys' fees."); *LG Funding, LLC v. Johnson & Son Locksmith, Inc.*, 170 A.D.3d 1153, 1154 (N.Y. App. Div. 2019); *Sempra Energy Trading Corp. v. P.G. & E. Tex. VGM, L.P.*, 284 A.D.2d 253, 254 (N.Y. App. Div. 2001) ("An award of attorneys' fees was proper since the parties expressly provided in their contract that, in the event of a default, the defaulting party would be responsible for costs and expenses, including attorneys' fees, incurred by the performing party as a result of the default."); *Montgomery-Otsego-Schoharie Solid Waste Mgmt. Auth. v. Cnty. of Otsego*, 249 A.D.2d 702, 703–04 (N.Y. App. Div. 1998) ("Defendant's failure to pay the GAT shortfall amount due under the contract constituted a default; consequently, under the provision for counsel fees in the event of a default, . . . MOSA's cause of action for counsel fees should not have been dismissed.").

By contrast, where the contract provided that attorney's fees should be awarded to a "prevailing party," or didn't specify what analysis should be used to award attorney's fees, New York courts have applied a prevailing party analysis. *See, e.g.*, *TAG 380, LLC v. ComMet 380, Inc.*, 890 N.E.2d 195, 201 (N.Y. 2008); *Sykes v. RFD Third Ave. I Assocs., LLC*, 39 A.D.3d 279, 279 (N.Y. App. Div. 2007); *Duane Reade v. 405 Lexington, L.L.C.*, 19 A.D.3d 179, 180 (N.Y. App. 2005).

The difference between a defaulting party analysis and a prevailing party analysis might matter in some circumstances, albeit not in these. As mentioned, the agreement provides that the "Non-Defaulting Party" gets attorney's fees from the "Defaulting Party," which includes a party that "fails to make a payment as required under th[e] Agreement." Southern Coal failed to make a payment as required under the agreement; it is the "Defaulting Party." For that reason, I reach the same conclusion under the defaulting party contractual provision as the majority reaches under the prevailing party analysis.

There's not much more that needs to be said about the proper route to follow to get to the same result. Because the result is the same either way, and because our decision does not bind any New York court anyway, I'll leave it at that.